**Affirmed in Part, Reversed in Part, and Remanded, and Opinion filed December 21, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00917-CV

---

## THE METHODIST HOSPITAL, METHODIST HEALTH CENTERS, BAYLOR COLLEGE OF MEDICINE, AND DONALD T. DONOVAN, M.D., Appellants

## V.

## CHERYL ADDISON, Appellee

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2017-05760**

---

## O P I N I O N

In this interlocutory appeal, appellants The Methodist Hospital, Methodist Health Centers[1], Baylor College of Medicine, and Donald T. Donovan, M.D., challenge

---

[1] Because we need not distinguish between the two Methodist entities at this stage of the litigation, we refer to both collectively as Methodist.

the trial court's order denying their respective motions to dismiss the medical malpractice claim filed by appellee Cheryl Addison. Dr. Donovan was scheduled to perform surgery on Addison at Methodist. Addison alleges she was injured prior to the surgery when a student nurse employed by either Baylor or Methodist gave her the wrong drug for anesthesia.

Methodist asserts in a single issue that the trial court abused its discretion because Addison's two expert reports lack elements required by section 74.351 of the Texas Civil Practice and Remedies Code and therefore constitute no report. We hold the trial court did not abuse its discretion when it denied Methodist's motion to dismiss because Addison's expert reports state with sufficient detail the standard of care applicable to the student nurse as a member of the anesthesia care team, how that standard was breached, and the causal relationship between this failure to meet the standard of care and the harm suffered by Addison. We therefore overrule Methodist's sole issue.

Baylor argues that the trial court abused its discretion when it denied its motion to dismiss because Addison's expert reports (1) do not mention Baylor, and (2) lack facts supporting Addison's vicarious liability theories against it. We overrule Baylor's issues because Addison's allegations against Baylor are based exclusively on vicarious liability and her expert reports adequately implicate the actions of an alleged Baylor agent or employee. Addison's experts properly relied on her petition, which alleged that both Baylor and Methodist were vicariously liable based on the actions of the student nurse.

Finally, Dr. Donovan argues that the trial court abused its discretion when it denied his motion to dismiss because Addison's experts: (1) did not address the standard of care required of a surgeon on these facts; and (2) offered no opinions establishing causation as to Dr. Donovan. We agree with Dr. Donovan that Addison's

2

expert reports are deficient with respect to the standard of care that a surgeon owed in these circumstances. Because we conclude that the deficiencies in the reports are not impossible to correct upon remand, we decline to dismiss Addison's case against Dr. Donovan and instead remand the case to the trial court for further proceedings.

## BACKGROUND

This is a health care liability claim involving an alleged medication error prior to a surgery. Addison was admitted to Houston Methodist Hospital for a surgical procedure. Before being transferred to the operating room, Addison alleges that she was seen in a pre-operative holding area by the anesthesiology care team (ACT), which consisted of Anil Mathew, M.D., Jennifer Terrasas, CRNA, Danielle George, CRNA, and a student nurse anesthetist from either Baylor or Methodist.[2] The surgery was to be performed by appellant Donald T. Donovan, M.D. Dr. Donovan was also in the pre-operative holding area with Addison.

While Addison was in the holding area awaiting her turn in the operating room, the student nurse administered what was thought to be Midazolam a/k/a Versed. It was later discovered that Addison was not given Versed, but was instead administered a paralytic drug, Rocuronium.[3] A short time later, Addison expressed that she was having difficulty breathing. Addison was soon unresponsive and was wheeled into the operating room. Minutes later, Addison's blood pressure was recorded as 207/120. Addison was not breathing and required assisted ventilation with a bag and mask. Addison had to be intubated. These events occurred while Addison was still awake. Addison alleges that she suffered various injuries—including hypoxic/anoxic

---

[2] Addison alleges that Dr. Mathew and nurses Terrasas and George were associated with Greater Houston Anesthesiology or U.S. Anesthesia Partners. These individuals and entities are not parties to this appeal.

[3] The erroneous administration of Rocuronium was confirmed by post-incident laboratory testing.

encephalopathy, post-traumatic stress disorder, and other neuropsychiatric illnesses—that her expert witnesses attribute to this incident.

The timing of the events in the pre-operative holding area and operating room is unclear from the present record.  Addison's medical records show different times that medications were administered to her, including the time she was erroneously given Rocuronium.  The record does not reveal at this stage of the litigation exactly how Addison was given the wrong drug.  Addison alleges that the error occurred in one of two possible ways: (1) the student nurse did not verify the type of drug before administering it, or (2) Methodist's hospital pharmacy mislabeled Rocuronium as Versed and the student nurse thought he was injecting Addison with Versed when, in fact, he was injecting Rocuronium.  According to Addison's anesthesiologist expert witness, ACT anesthesiologist Dr. Mathew was not present when Addison was given the wrong drug and stopped breathing soon thereafter; he had to be summoned to the scene.

Addison filed a medical malpractice lawsuit against numerous defendants, including appellants.  Among other allegations, Addison alleged that either Baylor or Methodist was vicariously liable for the negligence of the student nurse who administered the wrong drug.  In an effort to comply with section 74.351 of the Texas Civil Practice and Remedies Code, Addison filed and served the expert reports and curriculum vitae of Dr. Stephen A. Cohen and Dr. Patrick Hayes.

Dr. Cohen is a board-certified anesthesiologist.  In his report, Dr. Cohen states:

> The *American Society of Anesthesiologists' (ASA) Statement on the Anesthesia Care Team* documents that anesthesiologists provide anesthesia care either personally or by supervising trainees or non-physician anesthesia practitioners.  The latter model of care is designated the Anesthesia Care Team (ACT) approach whereby the anesthesiologist may delegate certain responsibilities to other members of the team (see below).  The ACT providing anesthesia services to Ms. Addison consisted

4

of Anil Mathew, M.D., Jennifer Terrasas, CRNA, Danielle George, CRNA, and [a student nurse anesthetist from either Baylor or Methodist], and the designation ACT hereinafter includes these individuals.

. . . .

The ASA's *Standards for Basic Anesthesia Monitoring* stipulate that, "Qualified anesthesia personnel shall be present in the room throughout the conduct of all general anesthetics, regional anesthetics and monitored anesthesia care . . . . Because of the rapid changes in patient status during anesthesia, qualified anesthesia personnel shall be continuously present to monitor the patient and provide anesthesia care." From the medical record, it does not appear that Dr. Mathew was present when Ms. Addison began to complain of dyspnea and then stopped breathing and became nonresponsive. CRNAs Terassas and George, although considered qualified anesthesia personnel did not appear to respond promptly to Ms. Addison's life-threatening status, which violates not only anesthesia standards of care, but also the American Heart Association's *Adult Basic Life Support* standards for both health care and non-health care personnel. This case turned out to not be a case at all, but rather, an emergency, whereby appropriate life support measures should have taken precedence. The extreme delay in taking such life supporting measures by Dr. Mathew and the CRNAs Terrassas and George displayed a substantial deviation from anesthesia standard of care, and such violation directly caused Ms. Addison's hypoxic/anoxic encephalopathy, PTSD, and subsequent neuropsychiatric illness as described in Dr. Hayes's report.

Moreover, the ASA's *Statement on Documentation of Anesthesia Care* requires that, "Accurate and thorough documentation is an essential element of high quality and safe medical care, and accordingly a basic responsibility of physician anesthesiologists." It also stipulates that intraoperative or procedural anesthesia must contain a "time-based record of events." The Standards for Basic Anesthesia Monitoring also require that, "During all anesthetics, the patient's oxygenation, ventilation, circulation and temperature shall be continually evaluated." This includes that, "During all anesthetics, a quantitative method of assessing oxygenation such as pulse oximetry shall be employed . . . ." And that, "Every patient receiving general anesthesia shall have, in addition to the above, circulatory function continually evaluated by at least one of the following: palpation of a pulse, auscultation of heart sounds, monitoring

of a tracing of intraarterial pressure, ultrasound peripheral pulse monitoring, or pulse plethysmography or oximetry." By failing to record pulse oximetry ($SpO_2$), the ACT deviated from these standards of care and such deviation directly caused Ms. Addison's hypoxic/anoxic encephalopathy, PTSD, and neuropsychiatric illness, as described more fully in Dr. Hayes's report.

. . . .

As mentioned above, the ASA's *Statement on the Anesthesia Care Team* permits the anesthesiologist, as director of the team to delegate to other members of the ACT, "monitoring and [appropriate] tasks by the physician to non-physicians." However, "overall responsibility for the Anesthesia Care Team and patients' safety ultimately rests with the anesthesiologist." Moreover, "Anesthesiologists will determine which perioperative tasks, if any, may be delegated. The anesthesiologist may delegate specific tasks to qualified non-anesthesiologist members of the Anesthesia Care Team providing that quality of care and patient safety are not compromised, will participate in critical parts of the anesthetic, and will remain immediately available for management of emergencies regardless of the type of anesthetic." Ms. Addison remembers that she received several medications including the alleged "midazolam" in the holding area from the [student nurse], not from Dr. Mathew or CRNAs Terrasas or George. Clearly, Dr. Mathew deviated from the standard of care in delegating the responsibility to the [student nurse] to administer drugs without making sure that the patient received the correct medications. By the same reasoning, CRNAs Terrasas and George violated the standard of care in allowing the [student nurse] to administer the medications that he did. Such deviations of the standard of care directly caused the severe injuries sustained by Ms. Addison.

. . . .

There is a considerable body of literature that indicates that psychiatric symptoms including posttraumatic stress disorder (PTSD) may result from the harrowing occurrence of being conscious but paralyzed by neuromuscular blocking drugs such as that suffered by Ms. Addison. . . .

Ms. Addison's treating psychiatrist, Patrick Hayes, M.D., summarizes a number of neurologic and psychiatric diagnoses obtained

6

from his review of certain other medical records and examination of Ms. Addison. He opines that she suffered a hypoxic/anoxic brain injury from being given rocuronium instead of midazolam and many subjective and objective psychological disturbances. . . .

Dr. Hayes quotes one of her treating neurologists, David L. Weir, M.D., that Ms. Addison suffered from, "Anoxic ischemic brain injury with associated visual acuity deficit . . . ." Eric R. Cerwonka, Psy.D. opined that, ". . . the evidence indicated that Ms. Addison suffers from a Prefrontal-Subcortical Dementia, due to the aforementioned anoxic event that occurred on November 18, 2014, [sic] when she was given an IV injection of . . . Rocuronium." Dr. Hayes offers further the DSM-5 psychiatric diagnoses of (1.) Posttraumatic Stress Disorder (PTSD; F43.10), (2.) Mild Neurocognitive Disorder Due to an Anoxic Event, Moderate Severity (MNC-Anoxic Event; G31.84), and (3.) Depressive Disorder Due to Sequelae of Rocuronium Poisoning and Anoxic Event with Major Depressive-Like Episode (F06.32). He opines, "that her entire symptom set and functional decrement is attributable to the traumatic paralytic administration and the subsequent development of symptoms described by PTSD, Neurocognitive Disorder, Depression, and Secondary Hypertension diagnoses listed. . . ." I agree with the opinions of Drs. Hayes, Weir, and Cerwonka that Ms. Addison's psychiatric injuries were medically caused by the events of November 19, 2014, and the breaches of the standard of care by Drs. Mathew and Donovan, CRNAs Terrasas and George, and the [student nurse], as I have described and explained in detail in this report.

Dr. Hayes is a psychiatrist who has treated Addison. His report addresses the psychiatric and other physical injuries Addison suffered, and he opines that those injuries were caused by the events underlying this litigation. Dr. Hayes reviewed voluminous medical records, which he summarized in his report. Among the records were those of Eric Cerwonka, Psy.D. Dr. Cerwonka concluded that "the evidence indicated that Ms. Addison suffers from a Prefrontal-Subcortical Dementia, due to the aforementioned anoxic event that occurred on November 18, 2014, when she was given an IV injection of what was thought to be a general anesthetic (Versed), but which actually turned out to be Rocuronium. This had an immediate effect of paralyzing all

7

muscle control and led to the subsequent anoxic event." According to Dr. Hayes, Addison's injuries include Post Traumatic Stress Disorder, Mild Neurocognitive Disorder, Depression, and Hypertension. Dr. Hayes attributes these injuries to the undisputed fact that Addison mistakenly received Rocuronium (a paralytic drug) rather than Versed prior to her surgery. More specifically, he attributes some of the injuries to Addison's lack of oxygen after the Rocuronium stopped her breathing and others to her experience of being alert during her acute resuscitation.[4]

> Similarly, Dr. Cohen opined that if the student nurse

> injected the rocuronium in the holding area at or before leaving there at 09:28 to transport the patient to the operating room, and given the few minutes it takes for the paralytic effects of rocuronium to take effect, a significant amount of time elapsed before Drs. Mathew and Donovan and the rest of the ACT began resuscitative efforts according to the timing of events in the medical chart – more than sufficient time for Ms. Addison to suffer the cerebral hypoxia and the neuropsychiatric injuries that are described in detail in Dr. Hayes's expert report.

Dr. Cohen then addressed the response of the entire medical team, including Addison's surgeon Dr. Donovan, to the medication error. According to Dr. Cohen, the "entire process [of determining the cause of Addison's medical issue and the commencement of resuscitative efforts] should have taken no more than a minute. Instead, it appears to have taken about 20 or 45 minutes. Such delay represents an egregious violation of anesthesia standard of care, which directly caused the injuries suffered by Ms.

---

[4] Dr. Hayes included a summary conclusion, which provides:

It is my professional medical opinion, at the standard of reasonable medical certainty, that the detailed diagnoses #1 through #4, presented above, are the result of the physiological, cognitive, and psychological symptoms caused by the inadvertent administration of rocuronium/Zemuron, the resulting anoxic brain injury, and the awake and alert experience of her poisoning and her acute resuscitation.

Addison." Dr. Cohen also addressed the alleged negligence of Methodist's hospital pharmacy:

> Moreover, one must question whether the hospital pharmacists provided "standardized" pre-prepared medications in syringes for use by anesthesiologist. This might indicate that the mistake in formulating rocuronium and midazolam syringes occurred in the pharmacy. Even if true, however, the delay by the ACT and Dr. Donovan in responding promptly to Ms. Addison's life-threatening apnea and unresponsiveness, which is described in detail in this report, represents an egregious violation of standard of care.

Baylor, Methodist, and Dr. Donovan objected to Addison's expert reports. They argued the reports were so deficient that they constituted no report and asked the trial court to dismiss Addison's claims against them. The trial court denied their motions. This interlocutory appeal followed.

## ANALYSIS

As summarized above, Methodist, Baylor, and Dr. Donovan have each made separate arguments that the trial court abused its discretion when it refused to dismiss Addison's claims against them. We address each appellant's arguments in turn.

## I. Standard of review and applicable law

We review for an abuse of discretion a trial court's ruling on a motion to dismiss for failure to comply with section 74.351. *Am. Transitional Care Cntrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Univ. of Tex. Med. Branch at Galveston v. Callas*, 497 S.W.3d 58, 62 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

The Texas Medical Liability Act requires a party asserting a healthcare liability claim to file an expert report and serve it on each party not later than 120 days after the

petition is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2017). Under the statute, an expert report means a written report that provides "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code § 74.351(r)(6). If a plaintiff does not timely serve an expert report meeting the required elements, the trial court must dismiss the healthcare claim on motion of the affected healthcare provider. *See id.* §§ 74.351(b), (l); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam); *Gannon v. Wyche*, 321 S.W.3d 881, 885 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). If elements of the report are found deficient, as opposed to absent, the court may grant a thirty-day extension to cure the deficiency. Tex. Civ. Prac. & Rem. Code § 74.351(c); *Gannon*, 321 S.W.3d at 885.

Although the expert report need not marshal all of the plaintiff's proof, it must include the expert's opinions on the three statutory elements of standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 878-79; *Kelly v. Rendon*, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The report need not use "magic words" and does not have to meet the same standards as evidence offered in a summary judgment proceeding or trial. *See Kelly*, 255 S.W.3d at 672 ("The expert report is not required to prove the defendant's liability."); *see also Jelinek v. Casas*, 328 S.W.3d 526, 540 (Tex. 2010) (stating no magic words are required). Bare conclusions or speculation, however, will not suffice. *See Wright*, 79 S.W.3d at 52, 53; *Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 23 (Tex. App.—Houston [14th Dist.] pet. filed).

To constitute a good-faith effort to comply with the expert report requirement, the report must provide enough information to fulfill two purposes of the statute: (1)

inform the defendant of the specific conduct the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018).

The goal of section 74.351 is to "deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (internal quotation marks omitted). The purpose of the statute is not to dispose of potentially meritorious claims. *Abshire v. Christus Health Southeast Tex. d/b/a Christus Hosp.-St. Elizabeth*, No. 17-0386, 2018 WL 6005220, at *3 (Tex. Nov. 16, 2018). Showing that a claim has merit requires an opinion that the alleged negligence of the medical provider proximately caused the plaintiff's injury. *See Zamarripa*, 526 S.W.3d at 460. Although the plaintiff need not actually prove the claim with the expert report, the report must show that the expert is of the opinion that the plaintiff can do so, including as to both foreseeability and cause-in-fact. *Id.*

An expert's mere *ipse dixit* regarding causation will not suffice; the expert must explain the basis of his or her conclusions, showing how and why a breach of the standard of care caused the injury. *See id*; *Jelinek*, 328 S.W.3d at 536. The conclusion must be linked to the facts of the case and cannot contain any gaps in the chain of causation. *See Wright*, 79 S.W.3d at 52; *Davis*, 542 S.W.3d at 23. We determine whether an expert opinion is sufficient under section 74.351 by considering the opinion in the context of the entire report, rather than taking statements in isolation. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015) (per curiam).

## II. Addison's expert reports adequately address the statutory elements with respect to Methodist.

Methodist contends in its sole issue on appeal that the trial court abused its discretion when it denied the motion to dismiss because Addison's expert reports are

so deficient they constitute no report. Methodist makes several discrete arguments in support of this contention, which can be summarized as follows: (1) Dr. Cohen did not opine in his report that Methodist or any of its employees violated a standard of care; (2) Dr. Cohen did not causally link any alleged breach of the standard of care by Methodist to Addison's injuries; (3) Dr. Cohen's use of questions in his report do not meet the expert report requirements found in the Texas Medical Liability Act; (4) Dr. Cohen, an anesthesiologist, is not qualified to render an opinion regarding hospital pharmacists' standard of care, nor does he opine that the Methodist pharmacists breached a standard of care; and (5) Dr. Cohen's assertion that Methodist breached the standard of care when it may not have prepared an incident report regarding a prior alleged medication mistake fails to meet the statutory requirement because it is unrelated to Addison's alleged treatment and injuries.

In this appeal, it is not disputed that Addison was administered Rocuronium rather than Versed prior to her surgery. It is also undisputed that the drug was administered by the student nurse anesthetist member of the ACT. Addison alleged in her original petition that the student nurse was associated with either Baylor or Methodist.[5] Addison based her claims against Methodist strictly on vicarious liability for the negligence of the student nurse and of Methodist's hospital pharmacists. There were no special exceptions lodged against Addison's petition.

We conclude that Dr. Cohen was entitled to rely on Addison's unrebutted allegations regarding the student nurse's relationship to Methodist in formulating his opinion. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012) ("Thus, we do not

---

[5] Addison alleged that "at all times material to this cause, Defendant [Baylor's] student registered nurse anesthetist was a student nurse or a student CRNA, acting within the course and scope of his studies, responsibilities, employment, and/or agency as a student, agent, servant, and/or employee, of Defendant [Baylor] and/or [Methodist]. Accordingly, [Baylor], and/or [Methodist] are liable pursuant to *respondeat superior*, agency, apparent and/or ostensible agency, and/or agency by estoppel, as those terms are defined and applied under the laws of the State of Texas."

see why an expert, in formulating an opinion, should be precluded from considering and assuming the validity of matters set out in pleadings in the suit, absent a showing that the pleadings are groundless or in bad faith or rebutted by evidence in the record."). Moreover, there is no indication in our record that the affiliation of the student nurse is a matter on which medical expert opinion is required,[6] and such an opinion might in any event be difficult to provide at this stage given the statutory limits on discovery. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (r)(6), (s). Because Dr. Cohen opined that the student nurse breached the standard of care when he administered the wrong drug to Addison, he was not required to name Methodist specifically in this part of his report. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013) ("To clarify, when a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory."); *Houston Methodist Hosp. v. Nguyen*, 470 S.W.3d 127, 130 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (stating that an "expert report is not required to name a hospital expressly or identify a standard of care breached by a hospital if the theory of liability against the hospital is based on the actions of the hospital's physicians" or other employees).

---

[6] In determining whether the employment or agency status of a health care provider must be addressed by expert testimony, the key question is whether that status is a matter requiring scientific or technical explanation beyond the experience of a lay factfinder. *See FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90–91 (Tex. 2004); *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360–61 (Tex. 2000). The answer to this question will differ from case to case. It is difficult to imagine, for example, how opinion testimony from a medical expert in the applicable standards of care would help the trier of fact determine whether a contract between a hospital and a health care provider created an employment relationship. *See Honeycutt*, 24 S.W.3d at 360–61; *Houston Methodist Hosp. v. Nguyen*, 470 S.W.3d 127, 131 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("A medical expert is not qualified to render an opinion on the legal issue of vicarious liability."). On the other hand, the supreme court has faulted an expert for failing to address whether a hospital controlled the details of a doctor's medical tasks to such a degree that the doctor was its agent. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008) (orig. proceeding).

We turn next to Methodist's contention that Dr. Cohen did not address causation of Addison's injuries. In a portion of Dr. Cohen's report that we quote in the background section above, he discusses the report of Dr. Hayes, Addison's treating psychiatrist and her second medical expert. As summarized by Dr. Cohen, Dr. Hayes opined that Addison's psychiatric injuries—including Prefrontal-Subcortical Dementia, PTSD, Mild Neurocognitive Disorder Due to Anoxic Event, and Depressive Disorder—were all caused by the erroneous injection of Rocuronium prior to her scheduled neck surgery, which caused her to stop breathing but left her aware of that fact and of the allegedly belated efforts to revive her. Dr. Hayes in turn relied on opinions of Addison's treating neurologist Dr. Weir and psychologist Dr. Cerwonka regarding the details of her injuries. Dr. Cohen opined that "I agree with the opinion of Drs. Hayes, Weir, and Cerwonka that Ms. Addison's psychiatric injuries were medically caused by the events of November 19, 2014, and the breaches of care by Drs. Mathew and Donovan, CRNAs Terrasas and George, and the [student nurse], as I have described and explained in detail in this report." A medical expert such as Dr. Cohen may rely on the reports and opinions of others in forming his own causation opinion. *See Kelly*, 255 S.W.3d at 676 ("While a nurse's report, standing alone, is inadequate to meet the requirements of the statute as to medical causation, nothing in the health care liability statute prohibits an otherwise qualified physician from relying on a nurse's report in the formation of the physician's own opinion."). As a result, we conclude that Dr. Cohen's report adequately linked Addison's injuries to the student nurse's alleged medication error.

Because we have determined that Dr. Cohen's report adequately addressed one theory of liability against Methodist, we need not address Methodist's remaining arguments, numbered three through five above, that the trial court abused its discretion when it denied Methodist's motion to dismiss. *See* Tex. R. App. P. 47.1; *Potts*, 392

S.W.3d at 632 (stating that "if any liability theory has been adequately covered, the entire case may proceed."). We overrule Methodist's sole issue on appeal and affirm the trial court's order as to Methodist.

## III. Addison's expert reports adequately address the statutory elements with respect to Baylor.

Baylor contends that the trial court abused its discretion when it refused to dismiss Addison's claims against it. In support, Baylor argues first that Addison's expert reports are deficient because they do not mention Baylor. Baylor also argues that the reports are inadequate because they do not (1) establish the standard of care it owed Addison, (2) include an explanation on how it breached that alleged standard of care, and (3) demonstrate how that breach caused harm to Addison. Finally, Baylor argues that the reports do not contain sufficient facts that would support Addison's vicarious liability theory against it.

We begin by addressing Baylor's arguments that the reports do not mention Baylor or address the standard of care and other required elements as to Baylor. The reports were not required to include these items so long as they adequately addressed a theory of vicarious liability based on the actions of Baylor's employees or agents. *See Potts*, 392 S.W.3d at 630 ("A report need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue."); *Nguyen*, 470 S.W.3d at 130. As discussed above with respect to Methodist, Addison alleged that a student nurse from either Baylor or Methodist gave her the wrong drug prior to her surgery. She further alleged that Baylor (or Methodist) was vicariously liable for that mistake. That is sufficient. *Nguyen*, 470 S.W.3d at 130. Additionally, as we explained above with respect to Methodist, we conclude that Dr. Cohen's report adequately addressed the required elements of standard of care, breach, and causation based on the student nurse's actions. Finally, with respect to Addison's vicarious liability theory, her

15

medical experts were allowed to rely on the vicarious liability allegations contained in her original petition. *See Loaisiga*, 379 S.W.3d at 261. We overrule Baylor's issues on appeal.

## IV.    Addison's expert reports are deficient as to Dr. Donovan, but the deficiencies are not impossible to correct on remand.

Dr. Donovan contends that Addison's expert reports are inadequate for several reasons. First, Dr. Donovan asserts that Dr. Cohen, an anesthesiologist, did not establish within the confines of his report and curriculum vitae that he was qualified to render an opinion regarding a surgeon's negligence. Second, Dr. Donovan contends that Dr. Cohen did not address the standard of care a surgeon owed under the circumstances present in this case. Third, Dr. Donovan argues that Dr. Cohen failed to explain how his actions, or inactions, caused Addison's injuries. Finally, Dr. Donovan argues that Dr. Hayes' report is deficient because it fails to address all three required statutory elements. As we explain below, although Dr. Cohen established he was qualified to render an opinion regarding Dr. Donovan's negligence, we conclude that his report fails to adequately explain the standard of care Dr. Donovan owed to Addison before her neck surgery began and, as a result, also failed to explain how Dr. Donovan breached that standard of care.

An expert is qualified to render an opinion against a physician regarding standard of care if the physician (1) is practicing medicine at the time of the testimony or was practicing medicine at the time the claim arose; (2) has knowledge of the accepted standard of care for diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *See* Tex. Civ. Prac. & Rem. Code § 74.401(a). In assessing whether the witness has the required knowledge, skill, experience, or training, the court shall consider whether the witness

is: (1) board certified or has other substantial training or experience "in an area of medical practice relevant to the claim," and (2) is actively practicing medicine "in rendering medical care services relevant to the claim." *Id.* § 74.401(c). We look only to the four corners of the expert report and the curriculum vitae to determine whether an expert is qualified. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The expert report and curriculum vitae must establish the witness's knowledge, skill, experience, training, or education regarding the specific issue before the court. *See Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 118−19 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Not every licensed physician is qualified to provide expert testimony on every medical question. *See Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). The expert's knowledge and experience must have a link to the facts at issue in the case. *See Burrell*, 230 S.W.3d at 759−60; *see also CHCA Mainland, L.P. v. Dickie*, No. 14-07-00831-CV, 2008 WL 3931870, at *6 (Tex. App.—Houston [14th Dist.] Aug. 21, 2008, no pet.) (mem. op.) (neither expert report nor curriculum vitae showed internist had experience or familiarity with decubitus ulcers, the condition relevant to the claim).

Dr. Cohen is a board-certified anesthesiologist currently practicing medicine in Massachusetts and New York. Dr. Cohen worked as an attending anesthesiologist at Beth Israel Deaconess Medical Center in Boston, Massachusetts. Dr. Cohen also served as an Assistant Professor of Anesthesia at the Harvard Medical School. Finally, Dr. Cohen stated in his report that he has "provided anesthesia care to many patients undergoing [the particular surgery] intended for Ms. Addison and am, therefore, familiar with not only what is required from an anesthesiologist, CRNA, and SNA, but also from a surgeon during such a procedure."

Dr. Donovan argues Dr. Cohen is not qualified to render an opinion against him because, in essence, he has not practiced as a surgeon. We rejected this contention in

*Kelly*. *See Kelly*, 255 S.W.3d at 672–74 (stating that the Medical Liability Act does not require that a medical expert practice in the exact same field as the defendant). The statute instead provides that a witness is qualified to render an opinion if the witness is board certified and "is actively practicing medicine in rendering medical care services relevant to the claim." Tex. Civ. Prac. & Rem. Code § 74.401(c); *see Pokluda*, 283 S.W.3d at 120. Here, Dr. Cohen's report and curriculum vitae demonstrate that he has knowledge, training, and experience rendering "medical services relevant to the claim" and is therefore qualified to render an opinion regarding what a surgeon should do when an anesthesia problem occurs in the operating room. *See Pokluda*, 283 S.W.3d at 120; *see also Burrell*, 230 S.W.3d at 759 (rejecting defendant physician's contention that medical expert's qualifications were conclusory); *Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (expert qualified to give opinion where he had knowledge, skill, training, and experience and where subject of claim fell within his medical expertise).

Dr. Donovan also argues that Dr. Cohen's report is deficient because Dr. Cohen failed to explain why a surgeon's "standard of care required him to engage in any physical resuscitative act, while Mathew and the ACT were in charge of correcting the medication error." Additionally, Dr. Donovan argues that Dr. Cohen's report is deficient as to causation because he "failed to articulate how the surgeon, before the operation had begun, would have the right and authority to intervene in the ACT's pre-operative anesthesia routine, when the ACT was headed by a fully qualified and licensed physician, supervising two fully qualified certified CRNAs."

Dr. Cohen stated in his report:

According to the medical record, Dr. Donovan accompanied Ms. Addison from the preoperative holding area to the OR, however he seemed to take no part in the resuscitation attempts made by the ACT even though the American College of Surgeons (ACS) *Statements on Principles* stipulates

18

that, "The primary attending surgeon is personally responsible for the patient's welfare throughout the operation . . . . The responsibility for the patient's postoperative care rests primarily with the operating surgeon . . . . The surgeon will ensure that the surgical patient receives appropriate continuity of care." His behavior was particularly egregious because Ms. Addison was his patient and he was the only physician present when she became unresponsive and stopped breathing. Moreover, in a letter he wrote on January 6, 2015, he said that, "O2 saturation remained 100% and vital signs were stable throughout the episode. The facts of this case have all been disclosed to the patient." These two sentences are false because the SpO2 was not recorded "throughout the episode" (see above), and if that is what Dr. Donovan told Ms. Addison, the second sentence is false also. Hence, Dr. Donovan deviated from surgical standard of care and such deviation directly led to, or exacerbated Ms. Addison's hypoxic/anoxic encephalopathy, PTSD, and other postoperative psychiatric illnesses as described by Dr. Hayes.

Dr. Donovan contends this statement of the standard of care he owed Addison is deficient because the alleged medication error, the diagnosis that she had stopped breathing, and the treatment to resuscitate her occurred before the operation began. In Dr. Donovan's view, therefore, he was neither required nor authorized to help Addison even though he was the only physician present when she expressed difficulty breathing on the way to the operating room and was unresponsive upon arrival in the operating room.

We agree with Dr. Donovan that Dr. Cohen's report, which addresses only a surgeon's standard of care during and after an operation, is deficient with regard to the standard of care Dr. Donovan owed Addison before the operation began. *See Zamarripa*, 526 S.W.3d at 461 ("Neither Spears nor Harlass explains how Valley Regional had either the right or means to persuade Dr. Ellis not to order the transfer or to stop it when he did."). Although it is possible for two physicians practicing different specialties to share the same standard of care, a medical expert must explain why, under the alleged facts of the case, they owed the same standard of care to the plaintiff. *See*

19

*Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Dr. Cohen failed to do so here. Because Dr. Cohen failed to explain adequately the standard of care Dr. Donovan owed, his report is also deficient in explaining how Dr. Donovan's actions, or inactions, breached the standard of care and caused Addison's injuries. *See Zamarripa*, 526 S.W.3d at 460 (stating that expert's "report must make a good-faith effort to explain, factually, how proximate cause is going to be proven"); *Rice v. McLaren*, 554 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2018, no. pet.) ("Our review is limited to the four corners of the report, and we cannot make inferences to establish the causal connection.").

Dr. Donovan argues that Addison's expert reports are so deficient that they constitute "no report," requiring this court to dismiss her claims against him. The Texas Medical Liability Act allows a trial court to grant a 30-day extension to cure a deficiency in an expert report, however, and the extension must be granted if the report's deficiencies are curable. *Zamarripa*, 526 S.W.3d at 461. Because the trial court denied Dr. Donovan's motion to dismiss, it never considered whether an extension was necessary. Although Addison's expert reports are deficient as described above, given the allegation that Dr. Donovan was the only physician present when the breathing problem occurred, we cannot say that it would be impossible to correct those deficiencies. For example, it is possible that all physicians share the same standard of care when presented with a medication error that causes a patient to become unresponsive. *See Gonzalez v. Perez*, 485 S.W.3d 236, 248 (Tex. App.—El Paso 2016, no pet.) ("As we noted previously, both wound care and infection prevention are subjects common to all fields of medical practice."). Because it is possible that Addison might be able to correct the deficiencies in her expert reports, and the trial court never considered whether an extension was necessary, we decline to dismiss Addison's claims against Dr. Donovan. We instead reverse the trial court's denial of

20

Dr. Donovan's motion to dismiss and remand for the trial court to consider whether to grant Addison a thirty-day extension. *See Zamarripa*, 526 S.W.3d at 461 ("While the report does not explain how that could have happened, we cannot say it would be impossible. The trial court here must be given the opportunity to consider an extension.").

## CONCLUSION

Having overruled Methodist's and Baylor's issues on appeal, we affirm the trial court's order denying their motions to dismiss. Having sustained Dr. Donovan's issue in part, we reverse the trial court's denial of his motion to dismiss and remand for the trial court to consider whether to grant Addison an extension of time to cure the deficiencies in her expert reports regarding Dr. Donovan.


/s/     J. Brett Busby
        Justice


Panel consists of Justices Boyce, Christopher, and Busby.