

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-19-00460-CV

_____

THOMAS ALEXANDER MITCHELL, M.D., Appellant

V.

LESA SWANSON, Appellee

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-307531-19

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Appellant Dr. Thomas Alexander Mitchell appeals the denial of his motion to dismiss appellee Lesa Swanson's health care liability claims. Appellant cites deficiencies in Swanson's expert reports—in particular, that they lack any explanation of how Appellant caused Swanson's injuries.

We agree that the reports are deficient, and so we hold that the trial court abused its discretion by overruling Appellant's motion. But Swanson's reports are not so devoid of substance that they constitute no reports at all, and they are not patently incurable either. Swanson is therefore entitled to remand, rather than outright dismissal of her claims, so that the trial court may consider whether to grant a thirty-day extension to cure the deficiencies.

## I. BACKGROUND

In 2016, Swanson was having pain in her lower back and legs, so she consulted Dr. Anil Kumar Kesani.[1] Dr. Kesani diagnosed her with various back conditions in the L4-5 and L5-S1 regions, and they discussed surgical and nonsurgical options for treatment. Dr. Kesani prescribed physical therapy and medication, and he recommended that she return to revisit the issue.

---

[1] The facts recited are in accordance with those alleged in Swanson's petition and expert reports. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 221 n.1 (Tex. 2018) (per curiam).

2

Swanson returned six months later without improvement. Dr. Kesani suggested that she consider surgery. Ultimately, Swanson agreed to undergo a combination of two spinal-fusion surgeries. Dr. Kesani performed the first surgery without incident.

However, the second surgery—the placement of fixating screws and rods—allegedly went awry: Dr. Kesani misplaced some of the screws so badly that they were drilled directly into the nerves in the center of the spine. Swanson alleged that upon waking from anesthesia, she immediately reported numbness, weakness, and extreme pain. According to Swanson, Dr. Kesani did not tell her the screws were misplaced, and he instead told her that any complications were due to her abnormal spinal anatomy. The next day, Dr. Kesani performed surgery to remove two of the screws and reposition others, but according to Swanson, her symptoms were not remedied.

Swanson filed suit against Dr. Kesani in 2019, alleging that his medical negligence left her with extensive, permanent injuries. In support of her claims against Dr. Kesani, Swanson submitted a seventeen-page expert report authored by Dr. Jerry Bob Blacklock.

She later amended her petition to allege claims against Appellant, a neurologist who participated in her second surgery remotely, and Dustin McHalffey, a technologist who assisted Appellant. To more specifically address Appellant's conduct, Swanson submitted an expert report authored by Dr. Amit Verma, in which he discussed his credentials and Appellant's role in Swanson's second surgery. Swanson's claims against Appellant and her expert reports are the subject of this appeal.

Appellant's role, Swanson's petition explained, was to monitor her neurological condition during the surgery using various techniques, including electromyography or "EMG," and to report any concerning changes in her readings in order to avoid damaging Swanson's nerves. According to the petition, Appellant's entries in the medical records stated that all of Swanson's neurological readings during the procedure were normal, but the fact that three screws went directly into her spinal nerves suggested that her readings could not have been normal. Thus, Swanson alleged that Appellant was negligent in monitoring and assessing her condition, in failing to notify the surgeon of changes in her condition to ensure that she received appropriate care, and in failing to properly document and preserve data relating to the neuromonitoring process.

Appellant objected to both of Swanson's expert reports and moved to dismiss her claims against him. The trial court overruled his objections and denied his motion. This appeal followed.[2]

## II.  ADEQUACY OF THE REPORT

Appellant's first, second, third, and fifth issues all share the same theme:  that Swanson's reports are inadequate. The first and second issues focus on inadequacies in Dr. Verma's report—namely, that Dr. Verma's report fails to adequately describe the

---

[2]The Legislature has provided for interlocutory appeal of the denial of a motion to dismiss under Texas Civil Practice and Remedies Code Section 74.351(b). Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9).  We therefore have jurisdiction to hear this appeal.

4

standard of care that applied to Appellant and how Appellant's breach of that standard caused Swanson's injuries. In his third issue, Appellant contends that Dr. Blacklock's report does not cure either of these inadequacies, because Dr. Blacklock's report was primarily concerned with Dr. Kesani's alleged negligence rather than Appellant's. And his fifth issue is a summation, in which he argues that his motion to dismiss should have been granted.

## A. Standard of Review and Applicable Law

The Texas Medical Liability Act (the Act) requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). An expert report is sufficient under the Act if it provides a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered failed to meet the standards, and the causal relationship between the failure and the injury. *Id.* § 74.351(r)(6). The trial court need only find that the report constitutes a "good faith effort" to comply with the Act's requirements. *Id.* § 74.351(*l*). An expert report demonstrates a "good faith effort" when it "(1) informs the defendant of the specific conduct called into question and (2) provides a basis for the trial court to conclude the claims have merit." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam) (cleaned up) (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). A report need not marshal all the claimant's proof, but a report that merely states the

5

expert's conclusions about the standard of care, breach, and causation is insufficient. *Id.*

We review the denial of a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *Id.* In analyzing a report's sufficiency, we consider only the information contained within the four corners of the report. *Id.* A reviewing court may not fill gaps in a report by drawing inferences or guessing as to what the expert meant or intended. *Moore v. Gatica*, 269 S.W.3d 134, 140 (Tex. App.—Fort Worth 2008, pet. denied). However, one expert need not address the standard of care, breach, and causation; multiple expert reports may be read together to determine whether these requirements have been met. *Abshire*, 563 S.W.3d at 223 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i)).

To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant should have done differently." *Id.* at 226 (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)). Ergo, related to the standard of care and breach, the expert report must explain what the health care provider should have done under the circumstances and what he did instead. *Palacios*, 46 S.W.3d at 880.

The causation element requires an expert to explain how and why the alleged negligence caused the injury in question. *Abshire*, 563 S.W.3d at 224. The report need not use the words "proximate cause," "foreseeability," or "cause in fact" because a report's adequacy does not depend on whether the expert uses any particular magic

6

words. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). But the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven. *Id.* Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Id.* For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission, the harm would not have occurred. *Id.*

**B.    Discussion**

By way of background, Dr. Verma's and Dr. Blacklock's reports together offer a clear picture of Swanson's condition, the procedures she underwent, and Appellant's role in the case. According to Dr. Blacklock's report, Swanson was diagnosed with degeneration of the spine due to wear and tear (spondylosis), a chronic stress fracture in one of her vertebral bones that led to instability (spondylolysis), and a slippage of the disc that caused radiating nerve pain (spondylolisthesis). To treat her condition, Dr. Kesani performed a two-stage spinal-fusion procedure. On April 25, 2017, Dr. Kesani successfully performed the first surgery, an anterior discectomy and fusion at L4-5 and L5-S1, in which he placed synthetic cages packed with donor bone into the two disc spaces and attached metal fixation plates to the vertebral bodies. On April 27, 2017, Dr. Kesani performed the second stage, in which he was to drill screws into the pedicle bones on the sides of the vertebrae and then connect those screws to rods running parallel to the spinal column. The result was meant to be a rigid metal structure

7

that held the bones in place so that the fusion could occur. But Dr. Blacklock explained that Dr. Kesani misplaced some of the screws so badly that they did not touch the pedicle bones at all; instead, he placed some screws far off to the side, and he drilled others directly into the nerves in the center of the spine.

Dr. Verma's report stated that Appellant's function during this second procedure was to oversee monitoring of Swanson's neurological signals to alert Dr. Kesani of any alarming changes which could indicate that the surgery was damaging Swanson's nerves. To that end, Appellant monitored Swanson's neurological condition using "somatosensory evoked potentials, H-reflex, EEG, EMG [and] train of four" techniques.

Dr. Verma's report also briefly described how Appellant breached the standard of care. Appellant's entries in the medical records stated that some of the neuromonitoring showed normal results with no dramatic changes during the procedure, but other monitoring results were missing—specifically, the records lacked "the printouts showing absence of stimulated EMG below the thresholds that are mentioned in the report or the printouts of the train of 4 responses showing the presence of actual twitches." In Dr. Verma's view, Appellant's account that all was well in the neuromonitoring was most likely inaccurate: as Dr. Verma saw it, the fact that Dr. Kesani drilled multiple screws directly into Swanson's spinal nerve roots would have likely produced significant changes in the neuromonitoring results, and it was "highly improbable" that no changes would be shown on the monitoring. Dr. Verma

8

believed that Appellant breached the standard of care by not alerting Dr. Kesani that there were significant changes in the neuromonitoring. Dr. Verma thought that Appellant also breached the standard of care by "fail[ing] to produce these waveforms," referring to Appellant's failure to produce the missing neuromonitoring results.

However, Dr. Verma's report lacks any specific discussion concerning what the standard of care required. We are left to work backward from Dr. Verma's assertion that Appellant breached the standard of care by not doing certain things; the report implies that, apparently, the standard of care required those things in the first place. *See Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011) ("For example, [the report] did not state the standard of care but only implied that it was inconsistent with the Physicians' conduct."). Thus, strictly speaking, while Dr. Verma explains what Appellant did not do (in terms of breach), Dr. Verma does not explain what Appellant should have done to begin with (in terms of the standard of care). *See Palacios*, 46 S.W.3d at 880.

Furthermore, completely absent from the report is any mention of how Appellant's alleged breaches caused harm to Swanson. Dr. Verma simply discusses the alleged breaches and then ends his report. He does not explain, for example, how Appellant's failure to report changes in the neuromonitoring led to Swanson's harm. We do not require an expert to incant the magic phrase "proximate cause," *see Zamarripa*, 526 S.W.3d at 460, but we do require him to draw a line, in the form of factual allegations, between the physician's conduct and the plaintiff's injury, *see Abshire*, 563 S.W.3d at 225. That line is absent from Dr. Verma's report.

9

Swanson contends that any gaps in Dr. Verma's report can be resolved by reading it in conjunction with Dr. Blacklock's report. *See, e.g.*, *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 515 (Tex. 2017) (per curiam) (holding that one report remedied potential deficiencies in another). We disagree. Dr. Blacklock's report does not aid Swanson's case against Appellant with respect to the standard of care, breach, or causation. Indeed, Dr. Blacklock's report detracts from her case on the standard of care. According to that report, the standard of care did not require any of the neuromonitoring that Appellant performed on Swanson:

> There were four types of neuromonitoring used in the surgeries described in this report. Only one of these four was actually of any potential value. That was EMG, electromyography, but this is just an adjunct that is sometimes useful but sometimes not. . . . The standard of care does not require the use of neuromonitoring for the type of surgery performed on Ms[.] Swanson.

Dr. Blacklock later reiterated that EMG monitoring was "purely adjunctive" and that while it is "potentially useful" in the typical case, it was "useless" in Swanson's case. He continued, "It would have not been below the standard of care to not use it at all in this case. Dr[.] Kesani was entirely responsible for placing the screws correctly and for verifying this with imaging, regardless of what the EMG showed or did not show." Dr. Blacklock repeated this thought yet again toward the end of the report, stating, "It would not be below the standard to not use neuromonitoring in this case. It was of no use in this case."

Nor does Dr. Blacklock's report add anything to Swanson's argument that Appellant's breaches caused her injuries. In the section of his report labeled "Causation," Dr. Blacklock opined that Swanson's injuries were caused by Dr. Kesani's actions alone: his negligent placement of the screws, his failure to immediately perform tests and recognize the problem when Swanson presented with extreme pain, his delay in performing corrective surgery, and the damaging effects of the corrective surgeries that he did eventually perform. Dr. Blacklock did not mention Appellant or his alleged breaches as potential causes.

With only an implied opinion on the standard of care, a brief opinion on breach, and no opinion at all on causation, Swanson's case somewhat resembles *Intra-Op Monitoring Services, LLC v. Causey*, No. 09-12-00050-CV, 2012 WL 2849281, at *3 (Tex. App.—Beaumont July 12, 2012, no pet.) (mem. op.). In that case, a doctor performed a gland-removal surgery while another physician remotely conducted neuromonitoring to locate and avoid a facial nerve, and the surgeon nevertheless accidentally cut the nerve. *Id.* at *1. The injured party sued the neuromonitoring physician, but in her expert report, the plaintiff offered only a cursory opinion on causation, stating a one-sentence conclusion that the breaches related to neuromonitoring had caused the nerve to be cut. *Id.* at *2. The court held that because the expert failed to explain his causation

11

opinion with factual specificity, the report did not meet the requirements of the Act.[3] *See id.* at *3–4.

A similar conclusion is called for here. Because the reports do not adequately address the required elements, they are deficient, and the trial court abused its discretion by overruling Appellant's motion. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Abshire*, 563 S.W.3d at 223. We sustain Appellant's first, second, third, and fifth issues.

## III. OPPORTUNITY TO CURE

We next consider Appellant's fourth issue, in which he maintains that the inadequacies in Swanson's reports are so complete that she effectively filed no report at all, such that she should be denied the opportunity to amend her reports.

The Act distinguishes between situations where a report is timely served but deficient and those where no report is served. *Taton v. Taylor*, No. 02-18-00373-CV,

---

[3]Nonetheless, the court ordered a remand rather than a dismissal. *Causey*, 2012 WL 2849281, at *4. The court concluded that remand was appropriate because the report's deficiencies were not patently incurable, because the report implicated the defendants' conduct, and because the plaintiff had served the report by the statutory deadline. *Id.*

On remand, the plaintiff served a supplemental report that outlined at least seven specific steps that were required by the standard of care and factually explained why the failure to take those steps caused the plaintiff's injury: by mishandling the neuromonitoring and misstating its results, the monitoring physician misled the surgeon into believing there was no risk in making certain incisions, and those incisions severed the nerve. *Intra-Op Monitoring Servs., LLC v. Causey*, No. 09-12-00597-CV, 2013 WL 1790875, at *3–4 (Tex. App.—Beaumont Apr. 25, 2013, no pet.) (mem. op.). In a subsequent appeal, the Beaumont court held that this specific, factual explanation was sufficient to satisfy the Act's dictates. *Id.* at *4.

2019 WL 2635568, at *8 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.). If a report is timely served but deficient, the trial court may grant a thirty-day extension to cure the deficiency. *Id.*

"In distinguishing between a deficient report and no report, we are guided by the supreme court's decision in *Scoresby* . . . ." *Id.* (citing *Scoresby*, 346 S.W.3d at 546). Under *Scoresby*, a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. *Scoresby*, 346 S.W.3d at 557. "[T]his is a minimal standard," *id.*, and thus we have held that "[w]hen we conclude that an expert report is deficient," we generally "do not render" judgment; instead, we usually "remand for the trial court to consider whether to grant a thirty-day extension," *UHP, LP v. Krella*, No. 02-19-00136-CV, 2019 WL 3756203, at *1 (Tex. App.—Fort Worth Aug. 8, 2019, no pet.) (per curiam) (mem. op.); *see Mangin v. Wendt*, 480 S.W.3d 701, 706 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("[W]hen the court of appeals finds deficient a report that the trial court considered adequate, the plaintiff should be afforded one 30-day extension to cure the deficiency, if possible." (internal quotation omitted)); *Rosemond v. Al–Lahiq*, 362 S.W.3d 830, 840 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("[M]ost purported expert reports are likely to fall into the deficient-report category and be eligible for a thirty-day extension . . . ."). The *Scoresby* court held that because the plaintiff's report satisfied this minimal standard, the plaintiff was entitled to an opportunity to cure, even though the

13

report did not state the standard of care but only implied that the standard was inconsistent with the physicians' conduct, and even though there were potential problems with the expert's qualifications as well. 346 S.W.3d at 557.

We arrive at a similar disposition. As in *Scoresby*, Dr. Verma's report addressed the standard of care only through implication, if at all, and it suffered other problems as well. *See id.* Nonetheless, Swanson satisfies *Scoresby*'s three-part test. Swanson timely served Dr. Verma's report just twenty-one days after Appellant filed his answer. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). Dr. Verma's report and curriculum vitae[4] set out his qualifications and expertise as they were relevant to neuromonitoring: he was the director of clinical neurophysiology at Houston Methodist Hospital, he oversaw the hospital's neuromonitoring program, and he had personally supervised thousands of cases since his graduation from Duke's medical school in 1999. And Dr. Verma's report suggested an opinion that Swanson's claim had merit and implicated Appellant's conduct by criticizing the neuromonitoring he performed, the results that he did and did not record, and his failure to communicate the significant changes in Swanson's neurological readings to Dr. Kesani. *Scoresby* therefore instructs that despite the report's deficiencies, remand is in order. *See* 346 S.W.3d at 557; *Hernandez v. Christus Spohn Health Sys. Corp.*, No. 04-14-00091-CV, 2015 WL 704721, at \*4 (Tex. App.—

---

[4]When the question of adequacy hinges on the expert's qualifications, the court also considers what is within the four corners of the expert's curriculum vitae. *See Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, 382 S.W.3d 619, 626 (Tex. App.—Fort Worth 2012, no pet.).

14

San Antonio Feb. 18, 2015, no pet.) (mem. op.) (holding that despite a report's complete failure to address causation, among other deficiencies, remand was required because the report satisfied *Scoresby*'s three-prong test); *Sanchez v. Martin*, 378 S.W.3d 581, 597 (Tex. App.—Dallas 2012, no pet.) (ordering remand because the report satisfied *Scoresby*, even though plaintiff's report failed to address the standard of care); *cf. Taton*, 2019 WL 2635568, at *9 (collecting cases that genuinely failed the *Scoresby* test).

Another consideration is whether curing the report's deficiencies appears to be impossible. The goal of the Act's expert-report requirement is to deter frivolous claims, and an inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable. *Scoresby*, 346 S.W.3d at 556. In *Zamarripa*, our supreme court determined that remand was appropriate because the court could not say that "it would be impossible" to cure the deficiencies. 526 S.W.3d at 461; *see Jepson v. Wyrick*, No. 02-18-00148-CV, 2019 WL 2042303, at *11 (Tex. App.—Fort Worth May 9, 2019, no pet.) (mem. op.) (ordering remand because "we cannot say that it is impossible for the deficiencies in the report to be cured"); *Methodist Hosp. v. Addison*, 574 S.W.3d 490, 506 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (same). Based on the content of Dr. Verma's report, we cannot conclude that its defects are patently incurable, which further counsels in favor of remand.

We will therefore remand this case for the trial court to consider whether to grant Swanson an extension. "The trial court should err on the side of granting additional time"; the court "should be lenient in granting thirty-day extensions and must do so if

deficiencies in an expert report can be cured within the thirty-day period." *Scoresby*, 346 S.W.3d at 549, 554. We overrule Appellant's fourth issue.

## IV. CONCLUSION

We reverse the trial court's order denying Appellant's motion and remand this case for further proceedings in accordance with this opinion. *See* Tex. R. App. P. 43.2(d).

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: October 15, 2020