**Affirmed and Memorandum Opinion filed October 31, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00772-CV

## FIRST NOBILIS SURGICAL CENTER, LLC D/B/A FIRST STREET SURGICAL CENTER AND MICHAEL CIARAVINO, M.D., Appellants

### V.

### PATRICIA PHILLIPS, Appellee

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-63372**

## MEMORANDUM OPINION

In this interlocutory appeal, Appellants, First Nobilis Surgical Center, LLC d/b/a First Street Surgical Center ("First Street") and Michael Ciaravino, M.D., challenge the trial court's denial of their motions to dismiss the healthcare liability claims of Appellee, Patricia Phillips, on the grounds that the expert reports[1] Phillips

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b).

served do not satisfy the expert report requirements under the Texas Medical Liability Act. We affirm.

## BACKGROUND

Phillips had breast implant surgery in 2005. On September 25, 2015, Dr. Ciaravino, a plastic surgeon, replaced Phillips's saline breast implants with silicone breast implants at First Street. On October 1, 2015, Phillips developed tenderness and redness on her right breast. She contacted Dr. Ciaravino's office and was prescribed oral ciprofloxacin and oral fluconazole. Dr. Ciaravino saw Phillips on October 2, 2015, and referred her to First Street for intravenous antibiotic treatment.

On October 5, 2015, Dr. Ciaravino removed Phillips's implants, and a wound culture was taken from her breast during the surgery. The next day, she was discharged with oral antibiotics (ciprofloxacin). By October 8, 2015, Phillips noted continued redness and drainage from her left breast, so she went to Memorial Hermann Hospital. She was hospitalized for treatment of cellulitis in both breasts.

At the time, wound cultures were obtained from her right and left breasts by an infectious disease doctor at the hospital. The cultures were positive for *Klebsiella oxytoca*. The cultures obtained on October 5 were positive for *Serratia marcescens*. These bacteria identified from her breast wounds are normally found in the human colon.

On October 14, 2015, Phillips required surgery to drain her left breast hematoma and her right breast was treated with a washout procedure. She was treated with Levofloxacin, a broad-spectrum oral antibiotic. She was discharged from Memorial Hermann Hospital on October 17, 2015.

Phillips sued Dr. Ciaravino and First Street on September 25, 2017. She alleged Dr. Ciaravino was negligent in failing to follow the appropriate standard of

care with regard to the medical care provided to her, which caused or contributed to cause her injuries and damages. Phillips alleged:

1. Defendant, CIARAVINO, failed to promptly and timely assess, recognize and/or acknowledge the signs, symptoms and/or evidence of post-surgical infection in Plaintiff, PATRICIA PHILLIPS' surgical wounds as heretofore described;

2. Defendant, CIARAVINO, failed to promptly and timely implement an appropriate response to the obvious signs of infection presented by Plaintiff, PATRICIA PHILLIPS;

3. Defendant, CIARAVINO, failed to promptly and timely swab Plaintiff, PATRICIA PHILLIPS' wounds and submit swabs to an appropriate pathology laboratory for culturing, analysis and diagnosis;

4. Defendant, CIARAVINO, failed to prescribe appropriate antibiotics to treat the infection in Plaintiff, PATRICIA PHILLIPS' surgical wounds resulting in the infection becoming resistant to antibiotics;

5. Defendant, CIARAVINO, failed to properly treat Plaintiff, PATRICIA PHILLIPS' post-surgical infection;

6. Defendant, CIARAVINO, failed to timely consult and/or refer Plaintiff, PATRICIA PHILLIPS, to an infectious disease specialist for a higher level of medical care and treatment; and

7. Defendant, CIARAVINO, failed to treat for serratia and/or the actual infection, ESBL Klebsiella.

Phillips asserted a medical-negligence claim against First Street and stated:

1. FIRST STREET Defendants[2] failed to sterilize and decontaminate the operating room surfaces to remove bacterial, viral, fungal, and/or any nosocomial infection, including but not limited to, ESBL Klebsiella and other multi-drug resistant organisms.

2. FIRST STREET Defendants failed to properly maintain for physician use sterile equipment/instruments and/or avoid cross-contamination to prevent ESBL Klebsiella and other multi-drug

---

[2] "FIRST STREET Defendants" includes Appellant, First Nobilis Surgical Center, LLC d/b/a First Street Surgical Center, as well as other entities that were named as defendants but are not relevant to this appeal.

resistant organisms.

3.     FIRST STREET Defendants failed to sterilize and decontaminate the surgical instruments/equipment used in the surgical procedure and/or avoid cross-contamination, prevent ESBL Klebsiella and other multi-drug resistant organisms.

4.     FIRST STREET Defendants failed to maintain the sterilization of the breast implant device and/or permit cross-contamination by ESBL Klebsiella and other multi-drug resistant organisms.

5.     FIRST STREET Defendants failed to supervise the operating room nursing staff's hygiene to avoid bacterial, viral, fungal, and/or any nosocomial infection and/or cross-contamination as a result of ESBL Klebsiella and other multi-drug resistant organisms.

6.     FIRST STREET Defendants failed to provide employees with proper supervision and failed themselves to render medical care in a manner that met the applicable standard of care.

7.     FIRST STREET Defendants failed to meet the duty to provide for the safety and care of Plaintiff, PATRICIA PHILLIPS.

First Street filed its original answer on October 30, 2017, and Dr. Ciaravino filed his original answer on November 2, 2017. Phillips served expert reports from (1) Drs. Tyler Curiel and Rathel Nolan on First Street on February 26, 2018, and (2) Dr. Lincoln Miller on First Street and Dr. Ciaravino on March 1, 2018. Both First Street and Dr. Ciaravino filed objections to the three expert reports and motions to dismiss in March 2018.

On April 11, 2018, Phillips filed a motion for a 30-day extension to provide supplemental reports to meet the objections of First Street and Dr. Ciaravino; attached to Phillips's motion was a revised report by Dr. Miller dated April 6, 2018. First Street and Dr. Ciaravino filed objections to Dr. Miller's revised report on April 30, 2018.

The trial court held a hearing on June 4, 2018. First Street argued the reports of Drs. Curiel and Nolan were deficient, and Dr. Miller's reports were untimely

4

served or, alternatively, deficient. Phillips argued the reports of Drs. Curiel and Nolan were not deficient and adequately addressed only First Street. Phillips admitted that Dr. Miller's report was "filed late as to First Street." She acknowledged Dr. Miller's original report "could be done better" but argued that Miller's revised report of April 6, 2018 is "solid" and cures the original report. Phillips argued she served the revised Miller report to demonstrate the original report "is a curable report" warranting the grant of a 30-day extension.

At the hearing on June 4, 2018, the trial court granted an extension to "try and fix" the reports of Drs. Curiel and Nolan but was concerned that Dr. Miller's report was late with regard to First Street. The trial court would not allow Phillips to cure the expert reports from Drs. Nolan and Curiel with a report from Dr. Miller unless caselaw supported Phillips's argument that a plaintiff is not limited to the original experts to cure deficiencies but is allowed to cure an expert report with her choice of a new expert. The trial court also granted an extension without limitation regarding Dr. Ciaravino, stating "so if there's issues, you got 30 days."

On June 7, 2018, Phillips filed a motion to allow additional expert reports. She petitioned the trial court to allow her to, among others, "use the amended expert report by Dr. Lincoln Miller" to cure any defects with regard to First Street; and she provided caselaw in support of her argument that the Supreme Court of Texas "mandates that she be allowed to provide reports from the experts of her choice."

On June 18, 2018, Phillips re-served Dr. Miller's revised report of April 6, 2018 on First Street and Dr. Ciaravino. This report is also referred to as Dr. Miller's third report.

On June 25, 2018, the trial court signed three orders. In the first order, the trial court (1) sustained Dr. Ciaravino's and First Street's objections to the original reports of Drs. Curiel, Nolan, and Miller as well as objections to Dr. Miller's revised

5

report; and (2) ordered that Phillips "was granted one 30-day extension on June 4, 2018 . . . to cure any deficiencies." In the second order, the trial court granted Phillips's "Motion for a 30-day extension of time to serve additional or supplemental expert reports." The trial court ordered that Phillips, within thirty days of June 25, 2018, (1) "serve any supplemental or amended reports prepared solely by either" Dr. Curiel or Dr. Nolan as to First Street; and (2) "serve any supplemental or amended reports prepared solely by" Dr. Miller as to Dr. Ciaravino. In the third order, the trial court lifted the second order's limitations and stated as follows:

> On the undersigned date[,] the Court considered the Plaintiff's Motion to Allow Additional Expert Reports. After review of the authority[,] the Court finds that the restriction limiting witness should be withdrawn.

> IT IS ORDERED that Plaintiff, Patricia Phillips, has no limitation as to the expert witness who [sic] she may choose to use for the purpose of "curing" any defect in the Expert Report applicable to any Defendant in this cause, during the time permitted to effect a cure of prior reports.

On June 29, 2018, Phillips served a revised expert report from Dr. Nolan. There is no dispute that Dr. Nolan's revised report, except for his qualifications, is essentially identical to Dr. Miller's third report.

In July 2018, Dr. Ciaravino and First Street filed motions to dismiss as well as objections to Dr. Miller's third report and Dr. Nolan's revised report.

The trial court held a hearing on the motions to dismiss on August 24, 2018. First Street argued that, because the trial court already had sustained its objections to Dr. Miller's revised report and signed an order finding the report deficient, the court should find Dr. Miller's third report and Dr. Nolan's revised report equally deficient as they are identical to Dr. Miller's revised report. Phillips countered that the trial court found Dr. Miller's report insufficient only because it was untimely

6

filed as to First Street and the court did not consider the substance of the report. Dr. Ciaravino also argued that Dr. Miller's third report is inadequate and reminded the trial court that it had signed an order sustaining objections to the original reports of Drs. Miller, Nolan, and Curiel as well as Dr. Miller's revised report. In response to the parties' arguments, the trial court stated:

> Okay. So let me say this. As I recall our prior meeting, we spent the large sum of it dealing with the lateness of these reports and whether or not we could switch out the expert, more so than dealing with the substantive issues with the reports. To be perfectly honest, Dr. Miller's report, I don't really have a problem with. To the extent that it sounds like Dr. Nolan signed off on Dr. Miller's report might be a problem later on down the road, but as far as pursuing the case, I'm not having a problem with that. So here's what I'm going to do: I'm going to overrule the objections to the reports for Ciaravino and First Street at this time.

After the hearing, the trial court signed an order denying the motions to dismiss. Dr. Ciaravino and First Street filed a timely interlocutory appeal.[3]

### STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's ruling on a healthcare provider's motion to dismiss a healthcare liability claim for an abuse of discretion. *Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 644 (Tex. App.—Houston [14th Dist.] 2019, no pet. h.); *Houston Methodist Hosp. v. Nguyen*, 470 S.W.3d 127, 129 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). In the absence of findings of fact or conclusions of law, we uphold a trial court's ruling on a motion to dismiss on any

---

[3] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (Vernon 2018) (permitting appeal from an interlocutory order that denies all or part of the relief sought by a motion under Civil Practice and Remedies Code section 74.351(b), except that an appeal may not be taken from an order granting an extension under section 74.351); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011) (The trial court's refusal to dismiss a healthcare liability claim is immediately appealable.).

7

theory supported by the record and infer any necessary findings of fact to support the ruling. *Harvey*, 578 S.W.3d at 644; *Nguyen*, 470 S.W.3d at 129. A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner or without reference to any guiding rules or principles. *Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006) (per curiam); *Harvey*, 578 S.W.3d at 644.

The Texas Medical Liability Act governs healthcare liability claims. *Nguyen*, 470 S.W.3d at 129; *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507. The Act entitles a defendant to dismissal of a healthcare liability claim if the defendant is not timely served with an expert report showing the claim has merit. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011). The Act specifies requirements for an adequate report and mandates "an objective good faith effort to comply" with these requirements. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6); *Scoresby*, 346 S.W.3d at 549. In determining whether a good faith effort has been made, the trial court is limited to the four corners of the report and cannot consider extrinsic evidence. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010); *Harvey*, 578 S.W.3d at 644.

An expert must establish that he is qualified to provide an acceptable report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5); *Harvey*, 578 S.W.3d at 644. The expert's qualifications must appear in the expert report and cannot be inferred. *Harvey*, 578 S.W.3d at 644; *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Thus, analysis of expert qualifications under section 74.351 is limited to the four corners of the expert's report and the expert's curriculum vitae. *Pokluda*, 283 S.W.3d at 117; *see also Harvey*, 578 S.W.3d at 644.

Further, an expert report must provide a fair summary of the expert's opinions regarding (1) the applicable standard of care; (2) the manner in which the care

provided failed to meet that standard; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *see also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875, 878 (Tex. 2001). To comply with these standards, the expert report must incorporate sufficient information to inform the defendant of the specific conduct the plaintiff has called into question and provide a basis for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 879; *see also Baty v. Futrell*, 543 S.W.3d 689, 693-94 (Tex. 2018). A report may not merely contain the expert's conclusions about these elements. *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d at 879. The expert must explain the basis for his statements and link his conclusions to the facts of the case. *Jelinek*, 328 S.W.3d at 539; *Harvey*, 578 S.W.3d at 645. A plaintiff need not present all the evidence necessary to litigate the merits of the plaintiff's case. *Palacios*, 46 S.W.3d at 879; *Harvey*, 578 S.W.3d at 645. The report may be informal and the information therein need not fulfill the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Palacios*, 46 S.W.3d at 879; *Harvey*, 578 S.W.3d at 645.

ANALYSIS

Dr. Ciaravino and First Street submitted separate briefing on appeal; Dr. Ciaravino presents five issues and First Street presents three issues. We begin by addressing Dr. Ciaravino's issues.

## I. Dr. Ciaravino's Issues

### A. Expert Qualifications

Dr. Ciaravino argues in his first issue that the trial court abused its discretion by overruling his objections to Dr. Nolan's and Dr. Miller's qualifications because these experts, who are infectious disease specialists, "fail to articulate credentials to

opine on the standard of care relevant to Dr. Ciaravino, a plastic surgeon." Dr. Ciaravino contends that Drs. Nolan and Miller did not demonstrate qualifications based on training or experience in the "standards of care for the diagnosis, care, or treatment as applied to a plastic surgeon in the peri- or post-operative phase of a patient's care."

### 1. Dr. Miller's Qualifications

Dr. Ciaravino contends that "Dr. Miller is not qualified to opine on the peri-operative and post-operative standards relevant to Dr. Ciaravino, a plastic surgeon" because: "Dr. Miller offers no insight as to where his promoted standards originated"; he did not state that "his promoted peri- or post-operative standards are substantially developed in the surgical arena or, more specifically, the plastic surgery arena"; he never articulated any credentials or "practical knowledge of what is usual or customary for plastic surgeons in the same peri- or post-operative situation that confronted Dr. Ciaravino"; and he did not "indicate the standards advanced are generally accepted in the medical field, much less plastic surgery."

We focus our initial analysis on whether Dr. Miller was qualified to opine on the post-operative standards of care. An expert report satisfying the requirements of the Texas Medical Liability Act as to a defendant "is sufficient for the entire suit to proceed against the defendant", even if "it addresses only one theory of liability alleged against that defendant." *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 42 (Tex. 2013); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630-32 (Tex. 2013). Thus, if Dr. Miller's report satisfies all the Act's requirements as to Phillips's claim against Dr. Ciaravino for negligence during post-operative care, we need not address arguments relating to a liability theory against Dr. Ciaravino for negligent pre-operative care. *See Methodist Hosp. v. Addison*, 574 S.W.3d 490, 502 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Potts*, 392 S.W.3d at 630-32. With that

in mind, we turn to the expert qualification requirements set out in the Act.

A person is qualified as an expert witness to render an opinion against a physician on the issue of whether the physician departed from accepted standards of medical care if the person is a physician who (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a). "Practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or serving as a consulting physician to other physicians who provide direct patient care. *Id*. § 74.401(b). In assessing whether the witness has the required knowledge, skill, experience, or training, the court must consider whether the witness is: (1) board certified or has other substantial training or experience "in an area of medical practice relevant to the claim"; and (2) actively practicing medicine "in rendering medical care services relevant to the claim." *Id*. § 74.401(c).

In his expert report,[4] Dr. Miller outlines his qualifications as follows:

I am a licensed Infectious Disease Physician in the State of New Jersey. I am board certified in the specialty of Internal Medicine and the subspecialty of Infectious Diseases. I received a B.A. from Brown University and an M.D. from the Sackler School of Medicine/University of Tel-Aviv. I did my internship and residency in Internal Medicine at the SUNY Buffalo Affiliated Hospitals Program and my Infectious Disease subspecialty training at Emory University. I have more than twenty-five years of experience in the field of

---

[4] We note that, when discussing Dr. Miller's expert report in our analysis of the parties' issues in this appeal, we are referring to Dr. Miller's report dated April 6, 2018, which all parties agree is the pertinent report.

11

Infectious Diseases. I am the Co-Chief, Section of Infectious Disease, at Saint Barnabas Medical Center, Livingston, New Jersey, where I serve as the Co-Chief of the Infection Control Committee and the Co-Chief of the Antimicrobial Stewardship Committee. I have extensive experience in the treatment of patients with breast infections, like Ms. Phillips, particularly those related to breast implants. I have significant experience in the prevention and treatment of nosocomial infections—infections acquired by patients directly from health care facilities—including infections acquired in the operating room setting. Additionally, I am a Clinical Associate Professor of Medicine at Rutgers - New Jersey Medical School. I frequently lecture medical residents and medical students about Infectious Diseases and I teach medical residents how to diagnose and treat patients with a variety of infectious diseases, including breast infections in patients like Ms. Phillips. I have attached a copy of my up-to-date curriculum vitae. Therefore, I am qualified, based on my education, training, and experience, to opine in this report.

Dr. Ciaravino's overarching complaint is that Dr. Miller is not qualified to opine on the relevant post-operative standards because Dr. Miller is not a plastic surgeon. Dr. Ciaravino argues Dr. Miller allegedly did not state "where his promoted standards originated," did not articulate that his stated post-operative standards are substantially developed in the "plastic surgery arena," did not articulate any credentials or "practical knowledge of what is usual or customary for plastic surgeons" in the "post-operative situation that confronted Dr. Ciaravino," and did not "indicate the standards advanced are generally accepted in the medical field, much less plastic surgery." Dr. Ciaravino seemingly takes the position that Dr. Miller is not qualified to render opinions in this case because Dr. Miller's specialty is in a different medical discipline from his own.

Although not every licensed physician is qualified to testify about every medical question, *see Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996), "expert qualifications should not be too narrowly drawn." *Larson*, 197 S.W.3d at 305. To qualify as an expert in a particular case, a medical expert need not practice in the

12

exact same field as the defendant physician. *Pokluda*, 283 S.W.3d at 118; *see also Broders*, 924 S.W.2d at 153-54; *Kelly v. Rendon*, 255 S.W.3d 665, 674 (Tex. App.—Houston [14th Dist.] 2008, no pet.); and *McKowen v. Ragston*, 263 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The test is whether the report and curriculum vitae establish the expert's knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003); *Pokluda*, 283 S.W.3d at 118-19. In determing whether a witness is qualified on the basis of training or experience to render expert opinions, the court shall consider whether the proffered witness (1) is board certified or has other substantial training or experience "in an area of medical practice *relevant* to the claim," and (2) is actively practicing medicine "in rendering medical care services *relevant* to the claim." Tex. Civ. Prac. & Rem. Code Ann. § 74.401(c) (emphasis added).

Here, the relevant medical services are those for a post-surgical patient showing signs and symptoms of infection in her breasts. Phillips specifically pleaded Dr. Ciaravino failed to (1) timely assess and recognize signs and symptoms of post-surgical infection; (2) timely implement an appropriate response to obvious signs of infection; (3) timely swab Phillips's wounds and submit swabs for culturing and analysis; (4) prescribe appropriate antibiotics to treat the infection; and (5) timely consult an infectious disease specialist.

Dr. Miller's report shows he is knowledgeable, skilled, and experienced in diagnosing and treating patients with breast infections like the one suffered by Phillips. In his report, Dr. Miller stated he is board certified in the specialty of infectious diseases and has "more than twenty-five years of experience in the field of Infectious Diseases." He is the co-chief of the infectious disease section at St.

13

Barnabas Medical Center and serves as the co-chief of both the infection control committee and the antimicrobial stewardship committee. He stated he has "extensive experience in the treatment of patients with breast infections, like Ms. Phillips, particularly those related to breast implants." Further, Dr. Miller stated he is a clinical associate professor of medicine at Rutgers-New Jersey Medical School, and he "frequently lecture[s] medical residents and medical students" about infectious diseases. He also teaches medical residents "how to diagnose and treat patients with a variety of infectious diseases, including breast infections in patients like Ms. Phillips." Thus, Dr. Miller is familiar with the standards of care applicable to physicians who care for patients presenting the same type of breast infection Phillips presented. *See Owens v. Handyside*, 478 S.W.3d 172, 186 (Tex. App.— Houston [1st Dist.] 2015, pet. denied).

We reject Dr. Ciaravino's contention that Dr. Miller is unqualified because he failed to articulate that his stated post-operative standards are substantially developed in the "plastic surgery arena," failed to state any credentials or "practical knowledge of what is usual or customary for plastic surgeons" in the "post-operative situation that confronted Dr. Ciaravino," and failed to "indicate the standards advanced are generally accepted in the medical field, much less plastic surgery." There was no need for Dr. Miller to discuss standards specific to the "plastic surgery arena" or discuss generally accepted standards in the field of plastic surgery when Phillips alleged Dr. Ciaravino was negligent in his post-surgery care of Phillips; post-surgery care of an infection is not specific to plastic surgeons. Infections are not diagnosed and treated differently by plastic surgeons than other physicians who diagnose and treat infections. For the same reasons, Dr. Miller also was not required to show credentials or "practical knowledge of what is usual or customary for plastic surgeons" in the "post-operative situation that confronted Dr. Ciaravino." And

14

contrary to Dr. Ciaravino's assertion, Dr. Miller's education and extensive experience offer "insight as to where his promoted standards originated."

Based on the expert report and curriculum vitae, we conclude Dr. Miller has the knowledge, training, education, and experience to render an opinion on the standards of care applicable to a physician who is presented post-surgery with a patient showing signs and symptoms of a breast infection like the one suffered by Phillips. *See McKowen*, 263 S.W.3d at 162, 164, 167 ((1) finding infectious disease specialist was qualified to opine about cardiothoracic surgeon's failure to properly monitor patient after diagnosis of infection; and (2) rejecting argument that expert must be a surgeon to be so qualified). Therefore, we hold the trial court acted within its discretion when it found Dr. Miller is qualified to render an opinion on the post-surgery standards of care at issue. *See id.*

### 2. Failure to Supplement Qualifications

Dr. Ciaravino also contends the "trial court should have sustained [his] objections to Dr. Miller's qualifications and dismissed the case because Dr. Miller never supplemented his qualifications." In that regard, Dr. Ciaravino contends the trial court sustained his objections to Dr. Miller's original report but then overruled his objections to Dr. Miller's revised report and denied his motion to dismiss even though Dr. Miller did not supplement his qualifications in the revised report.

First, we reject Dr. Ciaravino's contentions because we already have concluded that Dr. Miller is qualified to render at least an opinion on the standards of care applicable to a physician who is presented with a patient showing signs and symptoms of an infection like the one suffered by Phillips. There was no need for Dr. Miller to supplement his qualifications. Second, we reject Dr. Ciaravino's contention because a trial court may change or reverse its ruling while it has plenary power. *See Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*,

15

500 S.W.3d 26, 52 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("[A] trial court has the inherent authority to change, modify, or set aside an interlocutory order at any time before the expiration of its plenary power.") (citing *Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 84 (Tex. 1993) (per curiam)).

Accordingly, we overrule Dr. Ciaravino's first issue challenging Dr. Miller's qualifications to opine on the post-operative standards of care.[5]

## B. Breach of Standard of Care

Dr. Ciaravino contends in his third issue that Dr. Miller's "discussion of Dr. Ciaravino's alleged peri- and post-operative breaches is vague and conclusory." He contends Dr. Miller's "only critique is the conclusory posit that Dr. Ciaravino was responsible for overseeing" First Street's staff "as the head of the surgical team" but he fails to address a specific pre-operative breach. With respect to the alleged post-operative breach of the standard of care, Dr. Ciaravino contends that "Dr. Miller's opinions are vague and speculative as to when the infection could have been detected post-surgery and, more critically, when its severity curtailed to affect a better outcome."

In examining Dr. Ciaravino's issue, we focus our analysis on whether Dr. Miller's report adequately addresses breach of the applicable post-operative standard of care because the report need address only one theory of liability alleged against Dr. Ciaravino. *See Potts*, 392 S.W.3d at 630-32 (stating that "if any liability theory has been adequately covered, the entire case may proceed" with regard to that defendant). We review the sufficiency of the expert report by considering the expert's opinions in the context of the entire report; we do not take statements in

---

[5] We need not address Dr. Ciaravino's argument that Dr. Nolan is unqualified to "address peri-operative infection prevention standards as applied to Dr. Ciaravino, a plastic surgeon." *See* section I. D.

16

isolation.  *Rice v. McLaren*, 554 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

An expert report need not marshal the plaintiff's proof, but it must include the expert's opinions on all three statutory elements.  *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018); *Pokluda*, 283 S.W.3d at 121.  Although it is not sufficient for an expert simply to state that he knows the standard of care and assert it was not met, a fair summary is something less than a full statement of the applicable standard of care and how it was breached.  *Palacios*, 46 S.W.3d at 880; *Pokluda*, 283 S.W.3d at 121.  A fair summary need only set out what care was expected but not given. *Palacios*, 46 S.W.3d at 880; *Pokluda*, 283 S.W.3d at 121.

In his report, Dr. Miller states as follows:

*The Standard of Care*

. . .

### The Post-Operative Period

The standard of care for a physician caring for a post-breast-implant-surgery patient who presents with symptoms of potential infection, including redness, pain, and tenderness of the breast and surgical site requires the following:

    • Consultation with an Infectious Disease specialist.

It is the standard of care for a physician to consult an Infectious Disease specialist to help diagnose and optimally treat a patient with a postoperative breast infection related to recent breast implants. Infectious Disease physicians have particular training in the identification and treatment of particular bacteria that may be acquired in surgical and post-surgical environments. They have particular, specialized knowledge of appropriate antibiotics effective against specific pathogens and are best trained in identification of those pathogens and the most effective avenues of treatment. When a patient presents, within days of surgery, with symptoms of likely infection such as redness or tenderness of the surgical site, it is the standard of care for a surgeon or general practitioner to seek the advice of an infectious

disease specialist.

> • Immediately obtain a culture from the potentially infected site and send it for Microbiology Laboratory analysis.

Quick and effective treatment of infection requires quick identification of the infecting pathogen. This is unlikely to occur without a prompt culture of the infection. There are multiple possible infections that can occur in a post-surgical patient, and identifying the infecting bacterium is key to providing effective treatment. Without first identifying the pathogen, treatment becomes a "hit or miss" proposition. Infectious disease specialists are trained to provide particularized treatment, but they cannot do so without identification of the particular bacterium infecting a patient. Immediately obtaining a culture that can be grown to identify the pathogen is, consequently, the standard of care.

> • Prescribe appropriate antibiotic therapy tailored to address the patient's particular infection.

A prescription of antibiotics for a post-surgical patient—other than an immediate, short-term prescription that is broad-based and intended to head off the most likely culprits—should be informed by laboratory analysis and the opinion of an Infectious Disease specialist. Regardless, it should attempt to be effective, and it is unlikely that it will be without the appropriate consideration given to its choice. Again, this is the standard of care.

*Breach of the Standard of Care*

The nature of Ms. Phillips' infection suggests three potential avenues, all of which constitute breaches of the standard of care: inadequate skin decolonization or disinfection with antibacterial washes in the surgical field prior to the initiation of surgery; contamination of the breast implants; and/or, a break in sterile technique during surgery. If Ms. Phillips had had her surgery in a surgical facility that carefully practiced standard of care aseptic protocols and processes in the operating room that observed the standard of care, then Ms. Phillips would not have developed the infection previously described in either breast.

. . .

### The Post-Operative Period

> • Consultation with an infectious disease specialist.

Within days of her surgery, on October 2, 2015, Ms. Phillips presented

with clear symptoms of infection, and her effective treatment required the attention of an Infectious Disease specialist. Nevertheless, Dr. Ciaravino did not refer her to or seek a consultation from an Infectious Disease specialist. Some time between October 2 and October 5, Dr. Ciaravino must have reached the conclusion that the origin of Ms. Phillips' infection was her breast implants. This is indicated by the fact that he scheduled surgery to remove them on October 5. However, given the proximity of Ms. Phillips' original surgery and her presentation with infection, Dr. Ciaravino should have suspected infection during the peri-operative period immediately and sought immediate consultation with a specialist in Infectious Disease. His failure to do so was a breach of the standard of care.

- Immediately obtain a culture from the potentially infected site and send it for Microbiology Laboratory analysis.

Immediate culturing of an infection allows earlier detection and identification of a particular infectious pathogen before it grows to infect more tissues. When Ms. Phillips presented with evidence of infection at her surgical site, Dr. Ciaravino should have ordered a culture from that site, but he did not. Instead, Dr. Ciaravino waited three days—until Ms. Phillips' October 5 surgery—to obtain a culture and have it sent for laboratory analysis. This was a breach of the standard of care.

- Prescribe appropriate antibiotic therapy tailored to address the patient's particular infection.

On October 1, 2015, Dr. Ciaravino—without benefit of a lab culture or the consultation of an Infectious Disease specialist—prescribed Ms. Phillips oral ciprofloxacin, an antibiotic, and oral fluconazole, an anti-fungal. A day later, he referred her to First Street Hospital for intravenous antibiotics. On October 6, a day after removal of her breast implants, Dr. Ciaravino discharged Ms. Phillips home on more oral ciprofloxacin. But without appropriate investigation in the form of a lab culture and consultation with an Infectious Disease specialist to determine both the nature of her infection and the best treatment for it, Dr. Ciaravino's prescriptions proved to be ineffective. Ms. Phillips' infection continued to grow, not just the implants themselves but the surrounding tissue being infected. Dr. Ciaravino failed to tailor Ms. Phillips' antibiotic therapy to target what was likely an antibiotic resistant bacterium, and this was a breach of the standard of care.

19

In arguing that Dr. Miller's report is vague and conclusory, Dr. Ciaravino more specifically asserts the report is inadequate because Dr. Miller (1) did not discuss "*when* in [sic] the infection could have either been detected or when/how her outcome could have been changed had the standard Dr. Miller advances been complied with"; (2) failed to specify when the consultation with the infectious disease specialist should have happened; (3) failed to state when or if the bacteria could have been detected by a culture; and (4) failed to state what antibiotic therapy should have been provided.

Dr. Miller's report describes in detail the standard of care applicable to a physician who cares for "a post-breast-implant-surgery patient who presents with symptoms of potential infection, including redness, pain, and tenderness of the breast and surgical site"; this standard includes seeking advice from an infectious disease specialist, immediately obtaining a culture to identify the specific bacteria causing the infection, and prescribing antibiotic therapy that is tailored to the specific bacteria.

With regard to breach of the standard of care, Dr. Miller's report is neither vague nor conclusory. He stated Phillips "presented with clear symptoms of infection on October 2, 2015, and, "given the proximity of Ms. Phillips' original surgery and her presentation with infection, Dr. Ciaravino should have suspected infection during the peri-operative period immediately" and effective treatment required Dr. Ciaravino to seek "immediate consultation with a specialist in Infectious Disease." He concluded Dr. Ciaravino's failure to immediately seek the advice of an infectious disease specialist when Phillips presented with an infection shortly after her surgery constituted a breach of the standard of care.

Dr. Miller also opined that Dr. Ciaravino's failure to immediately obtain a culture from Phillips's surgical site when Phillips first presented with an infection

and send it for laboratory analysis was a breach of the standard of care because "[i]mmediate culturing of an infection allows earlier detection and identification of a particular infectious pathogen before it grows to infect more tissues." Tying into this alleged breach, Dr. Miller stated that the failure to prescribe antibiotic therapy tailored to address Phillips's particular infection was a breach of the standard of care. He explained that without the benefit of a lab culture and an infectious disease specialist, Dr. Ciaravino could not prescribe effective antibiotics that targeted the specific bacteria causing Phillips's infection; instead, he prescribed different ineffective antibiotics that proved to be ineffective and could neither stop nor treat the infection.

We reject Dr. Ciaravino's assertion that the expert report is inadequate because Dr. Miller did not discuss "*when* in [sic] the infection could have either been detected or when/how her outcome could have been changed had the standard Dr. Miller advances been complied with." Dr. Miller's report states "Dr. Ciaravino should have immediately suspected infection—and, indeed, by his prescription of ciprofloxacin, it appears he did—of causing Ms. Phillips' symptoms." Further, "when/how her outcome could have changed" is not a proper complaint regarding whether the expert report sufficiently explains how Dr. Ciaravino breached the applicable standard of care. Contrary to Dr. Ciaravino's contention, Dr. Miller did not "fail[] to specify when the consultation with the infectious disease specialist should have happened" because he stated that "Dr. Ciaravino should have suspected infection during the peri-operative period immediately and sought immediate consultation with a specialist in Infectious Disease."

We further reject Dr. Ciaravino's complaint that the report fails to state when or if the bacteria could have been detected by a culture. Here, the bacteria clearly was detected after a culture was obtained. *When* the bacteria could have been

21

detected is an irrelevant inquiry in determining whether there was a breach of the standard of care. The standard of care requires a culture be taken immediately and the fact that Dr. Ciaravino failed to immediately take a culture is a breach thereof.

We also disagree with Dr. Ciaravino that the report is "silent as to what kind of antibiotic therapy should have been provided" to Phillips. The report states that the therapy should have been informed by the culture lab results, which in this case revealed specific bacteria that should have been targeted with antibiotics "like Meropenem + Vancomycin."

We conclude the trial court acted within its discretion when it determined Dr. Miller provided a fair summary of how Dr. Ciaravino deviated from the described post-operative standard of care. Accordingly, we overrule Dr. Ciaravino's third issue concerning the adequacy of Dr. Miller's report with respect to the applicable post-operative standard of care.[6]

### C. Causation

Dr. Ciaravino argues in his fifth issue that "Dr. Miller['s] and Dr. Nolan's opinions as to the peri-operative cause of the infection is speculative, as is Dr. Miller's opinion as to the effect of Dr. Ciaravino's post-operative care, which is couched in terms of possibilities, speculation or nothing at all."

In analyzing Dr. Ciaravino's issue, we focus on whether Dr. Miller's report adequately addresses causation with regard to Dr. Ciaravino's alleged post-operative negligence because the report need address only one theory of liability alleged against him. *See Potts*, 392 S.W.3d at 630-32 (stating that "if any liability theory has been adequately covered, the entire case may proceed" with regard to that

---

[6] We need not address Dr. Ciaravino's argument that Dr. Miller's report inadequately addresses breach of the applicable pre-operative standard of care. *See infra* section I. D.

22

defendant).

The Legislature enacted the expert report requirement in section 74.351 to deter frivolous claims. *See Palacios*, 46 S.W.3d at 878. The statute does not require a plaintiff to marshal all of the proof necessary to establish causation at trial. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); *see also Potts*, 392 S.W.3d at 631 ("[T]he purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits.") (internal quotations omitted). Nor does a plaintiff have to provide an expert report that anticipates and rebuts all possible defensive theories that ultimately may be presented at trial. *Monga v. Perez*, No. 14-16-00961-CV, 2018 WL 505263, at *11 (Tex. App.— Houston [14th Dist.] Jan. 13, 2018, pet. denied) (mem. op.).

However, an expert report must include a fair summary of the expert's opinions regarding the causal relationship between (1) the failure of the physician to provide care in accord with the pertinent standard of care and (2) the injury, harm, or damages claimed. *Harvey*, 578 S.W.3d at 653. An expert must explain, based on the facts set forth in the report, how and why a physician's breach of the standard of care caused the injury. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224 (Tex. 2018) (per curiam); *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459-60 (Tex. 2017). A bare expert opinion that the breach caused the injury is not enough. *Harvey*, 578 S.W.3d at 653. In assessing whether the expert's causation conclusions are detailed enough, as with breach of the standard of care, we read the expert's conclusions on causation in the context of the entire report, not piecemeal or in a vacuum. *Id*.

With regard to causation, Dr. Miller's report provides, among other things, as follows:

*Causation*

23

. . .

### The Post-Operative Period

Because of the proximity between her surgery and her presentation with infection, Dr. Ciaravino should have immediately suspected infection—and, indeed, by his prescription of ciprofloxacin, it appears he did—of causing Ms. Phillips' symptoms. Nevertheless, Dr. Ciaravino did not consult an Infectious Disease specialist to help diagnose and treat Ms. Phillips' breast infections.

Post-surgical infections are serious, complicated, and sometimes involve unusual bacteria as causative organisms, such as *Serratia marcescens* or *Klebsiella oxytoca* ESBL positive. Infectious Disease specialists treating aggressive infections such as Ms. Phillips' infection are trained to optimally diagnose and treat patients with common and uncommon infections, including those caused by multi-drug-resistant organisms. Dr. Ciaravino's failure to take a culture from Ms. Phillips' infected surgical site resulted in a three-day delay in diagnosis that permitted drug-resistant bacteria to grow.

If Dr. Ciaravino had consulted an Infectious Disease specialist, while Ms. Phillips was admitted to First Surgery Hospital, on October 2, then I think that the cause of her breast infections would have been diagnosed sooner and treated better with intravenous antibiotics such as Meropenem, that specifically targeted her causative organisms *Serratia marcescens* and *Klebsiella oxytoca*. The Infectious Disease Physician would have provided broad spectrum intravenous antibiotic treatment - like Meropenem + Vancomycin - for Ms. Phillips, targeting both gram-positive and gram-negative bacteria, likely pathogens for Ms. Phillips.

Additionally, the treating Infectious Disease physician would have made sure that she was receiving a tailored antibiotic - most likely an intravenous antibiotic - that specifically targeted the bacteria that grew from her culture that was obtained at surgery on October 5, and that could have been identified several days earlier. A reasonable Infectious Disease physician would have ordered bilateral breast wound cultures on October 2, 2015, when admitted or at the time he initially saw her prior to admission. An Infectious Disease physician would not have sent Ms. Phillips home before the culture results came back, instead, keeping her hospitalized on an intravenous antibiotic or antibiotics that would have most likely treated her causative organisms, namely the

24

*Serratia marcescens* and *Klebsiella oxytoca*. Once the culture results were back, the Infectious Disease physician would most likely have ordered a PICC line to send her home on targeted therapy with an intravenous antibiotic. This would have resulted in successfully treating her bilateral breast infections over a much shorter time frame - seven to ten days, as opposed to nearly three weeks - and it would have prevented her from having a second admission for prolonged treatment at Memorial Hermann Hospital.

By not consulting an Infectious Disease physician and, instead, discharging Ms. Phillips home on an oral antibiotic, Ciprofloxacin, that failed to treat her breast infections, Dr. Ciaravino caused Ms. Phillips to require a second prolonged hospitalization - lasting eleven days - to treat her bilateral breast infections.

Prompt identification of an infectious pathogen—particularly a drug-resistant one—is essential for its effective treatment. Even a few days is enough for an infection to grow, spread, and become much more serious. Elite labs completed its analysis that found *Serratia marcescen* in the right breast in three days. Had Dr. Ciaravino initiated the testing of the right breast three days earlier, on October 2, 2015, as opposed to on October 5, when he took a culture, it is reasonable to conclude that this drug-resistant organism would have been identified prior to her discharge from First Street Hospital, and effective treatment could have and likely would have begun immediately. In my experience with the two infection sources involved, avoiding this three-day delay in providing proper treatment would have certainly significantly reduced the spread of the infection and the length of her hospital stay, the pain and discomfort associated with the infection, and the cost of the medical care that was needed. Dr. Ciaravino's failure to take appropriate measures increased the treatment difficulty of these drug resistant organisms, required Ms. Phillips to undergo additional medical treatment and caused her significant additional pain.

Dr. Ciaravino contends that "Dr. Miller's opinions as to the causal effect of Dr. Ciaravino's alleged post-operative negligence in delaying diagnosis and treatment so as to prolong" Phillips's course of care are conclusory and speculative. In that regard, he contends Dr. Miller (1) did not state that the bacteria found on Phillips's breasts could have been detected earlier; (2) offered no basis for the conclusion that

earlier detection of the bacteria by an infectious disease specialist would have been possible and would have "shortened Phillips' clinical course" or the severity of the infection; (3) did not explain that "earlier treatment with 'tailored' antibiotics would have been effective in shortening the duration of Phillips' infection"; and (4) did not state "Meropenem + Vancomycin were needed to arrest th[e] infection."

Dr. Miller's report is neither conclusory nor speculative. He explained why Dr. Ciaravino's failure to consult an infectious disease specialist, immediately obtain a culture, and prescribe antibiotic treatment informed by laboratory culture analysis caused Phillips's infection to spread and caused her additional and prolonged pain. He stated that Dr. Ciaravino recognized Phillips had an infection when he prescribed her antibiotics on October 2, 2015. But because post-surgical infections "are serious, complicated, and sometimes involve unusual bacteria" — like the one found on Phillips's breast, it was important to immediately order bilateral breast wound cultures, which an infectious disease specialist would have done. Dr. Miller explained that Dr. Ciaravino delayed getting a culture from the infected surgical site until October 5, and this "three-day delay in diagnosis . . . permitted drug-resistant bacteria to grow." Dr. Miller explained that an infectious disease specialist would have obtained a culture immediately and the bacteria would have been discovered several days earlier, which, in turn, would have ensured Phillips received tailored antibiotics informed by laboratory analysis.

We reject Dr. Ciaravino's assertion that Dr. Miller did not state the bacteria found on Phillips's breasts could have been detected earlier or that earlier detection of the bacteria by an infectious disease specialist would have "shortened Phillips' clinical course" or the severity of the infection. Dr. Miller explained that an infectious disease specialist would not have delayed ordering a culture by three days when "[e]ven a few days is enough for an infection to grow, spread, and become

26

much more serious." Dr. Miller stated that "Elite labs completed its analysis that found *Serratia marcescen* in the right breast in three days"; he concluded that "[h]ad Dr. Ciaravino initiated the testing of the right breast three days earlier, on October 2, 2015, as opposed to on October 5, when he took a culture, it is reasonable to conclude that this drug-resistant organism would have been identified prior to her discharge from First Street Hospital, and effective treatment could have and likely would have begun immediately." He also concluded that, in his experience, "avoiding this three-day delay in providing proper treatment would have certainly significantly reduced the spread of the infection and the length of her hospital stay, the pain and discomfort associated with the infection, and the cost of the medical care that was needed."

We also reject Dr. Ciaravino's contention that Dr. Miller's opinions are conclusory and speculative because he did not state "Meropenem + Vancomycin were needed to arrest th[e] infection." Dr. Miller did not have to state that "Meropenem + Vancomycin" were the only drugs that could have targeted Phillips's infection and therefore were "needed" because he named these two drugs as examples of effective drugs. Dr. Miller stated that, if an infectious disease specialist had been consulted on October 2, "[t]he Infectious Disease Physician would have provided broad spectrum intravenous antibiotic treatment - *like* Meropenem + Vancomycin - for Ms. Phillips, targeting both gram-positive and gram-negative bacteria, likely pathogens for Ms. Phillips."

Further, Dr. Ciaravino incorrectly claims Dr. Miller did not explain that "earlier treatment with 'tailored' antibiotics would have been effective in shortening the duration of Phillips' infection." Dr. Miller explained that the "bacteria that grew from [Phillips's] culture . . . could have been identified several days earlier" had a culture been immediately taken on October 2, instead of three days later. Dr. Miller

also explained that, "[o]nce the culture results were back," an infectious disease specialist would have ordered "a PICC line to send her home on targeted therapy with an intravenous antibiotic"; "[t]his would have resulted in successfully treating her bilateral breast infections over a much shorter time frame - seven to ten days, as opposed to nearly three weeks - and it would have prevented her from having a second admission for prolonged treatment at Memorial Hermann Hospital."

We conclude the trial court acted within its discretion in finding Dr. Miller's opinions regarding causation suffice to meet the minimum statutory requirements. Accordingly, we overrule Dr. Ciaravino's fifth issue with regard to his argument that Dr. Miller's report inadequately addresses "the causal effect of Dr. Ciaravino's alleged post-operative negligence."[7]

### D.     Conclusion

Because we have determined that Dr. Miller's expert report adequately addresses one theory of liability against Dr. Ciaravino—negligence during post-operative care, we need not address (1) Dr. Ciaravino's second issue complaining that Dr. Miller in his expert report applied a "global standard of infection control" and failed to state how each defendant breached the pre-operative standard of care; (2) Dr. Ciaravino's arguments in issues one, three, and five relating to the adequacy of Dr. Miller's expert report addressing pre-operative care; and (3) Dr. Ciaravino's arguments in issues one, four, and five relating to the adequacy of Dr. Nolan's expert report addressing only pre-operative care. *See Potts*, 392 S.W.3d at 630-32 (stating that "if any liability theory has been adequately covered, the entire case may

---

[7] We need not address Dr. Ciaravino's argument that Dr. Miller's or Dr. Nolan's reports inadequately address the causal effect of Dr. Ciaravino's alleged pre-operative negligence. *See infra* section I. D.

proceed" with regard to that defendant); *Addison*, 574 S.W.3d at 502 (same). We overrule Dr. Ciaravino's issues, and we affirm the trial court's order denying Dr. Ciaravino's motion to dismiss.

## II. First Street's Issues

### A. Trial Court's Ruling

In its first issue, First Street argues the trial court abused its discretion by (1) not finding Dr. Miller's third report and Dr. Nolan's revised report deficient and (2) denying First Street's motion to dismiss because these two reports are identical to Dr. Miller's revised report (which the trial court already had found to be deficient at the June 4, 2018 hearing and signed an order reflecting its ruling). First Street argues no new opinions were offered in Dr. Miller's third report and Dr. Nolan's revised report; therefore, we "should find that the trial court abused its discretion in not granting First Street's motion to dismiss."

We note the trial court was not concerned with the substance of Dr. Miller's report at the June 4, 2018 hearing; instead, it was concerned with the untimeliness of the report. At the August 24, 2018 motion to dismiss hearing, the trial court stated: "As I recall our prior meeting, we spent the large sum of it dealing with the lateness of these reports and whether or not we could switch out the expert, more so than dealing with the substantive issues with the reports. To be perfectly honest, Dr. Miller's report, I don't really have a problem with."

Even if the trial court found Dr. Miller's revised report to be deficient, it has the authority to alter its order before the expiration of its plenary power. *See Better Bus. Bureau of Metro. Houston, Inc.*, 500 S.W.3d at 52 ("[A] trial court has the inherent authority to change, modify, or set aside an interlocutory order at any time before the expiration of its plenary power.") (citing *Fruehauf Corp.*, 848 S.W.2d at

29

84). Therefore, we overrule First Street's first issue.

## B. Breach of Standard of Care

In its second issue, First Street contends the trial court improperly denied its motion to dismiss because Dr. Miller's third report and Dr. Nolan's revised report do not explain how it breached the applicable standard of care.

As we stated above, an expert report need not marshal the plaintiff's proof, but it must include the expert's opinions on all three statutory elements. *Pokluda*, 283 S.W.3d at 121. Although it is insufficient for an expert to simply attest to knowledge of the standard of care and assert it was not met, a fair summary is something less than a full statement of the applicable standard of care and how it was breached. *Palacios*, 46 S.W.3d at 880; *Pokluda*, 283 S.W.3d at 121. A fair summary need only set out what care was expected but not given. *Palacios*, 46 S.W.3d at 880; *Pokluda*, 283 S.W.3d at 121.

Dr. Miller's report[8] provides (in pertinent part) as follows:

**Analysis**

You asked me to review the medical records to determine if there was a deviation from the standard of care.

I believe that there were multiple likely deviations from the standard of care concerning Ms. Phillips' treatment that she received during the peri-operative period at First Street Surgical Center on September 25, 2015, when she had her silicone implants placed. The primary deviation was in the aseptic technique used in the operating room where she underwent her silicone breast implants, but there are multiple potential avenues for this deviation. The bacteria that were subsequently identified from her breast wounds, *Serratia marcescens* and *Klebsiella oxytoca*, can be considered part of the normal colon flora.

---

[8] Because there is no dispute that Dr. Miller's third report and Dr. Nolan's revised report are almost identical in their discussion of the pre-operative care, we quote Dr. Miller's report here; however, we will note any additional opinions Dr. Nolan expressed in his report in our analysis of First Street's arguments.

30

Consequently, their presence in her infected breast implants suggests probable fecal contamination. Additionally, *Serratia sp.* associated infections acquired from a hospital or medical facility have been linked to contaminated water and disinfectant solutions. The source of the fecal-contaminated material with these bacteria would not likely be specifically identified in the First Street Surgical Center records, but, the presence of these particular bacteria in Ms. Phillips' breasts post-surgery indicate a break (failure) in aseptic technique used in the operating room, again, potentially resulting from multiple deviations from the standard of care. Moreover, *Klebsiella oxytoca* is not an airborne bacterium. It is generally spread through person-to-person contact, such as through contact with the infected hands of healthcare personnel and, less commonly, through contamination of the healthcare environment. The presence of *Klebsiella oxytoca* in Ms. Phillips['] infected breast implants is, again, indicative of breaches of the standard of care, potentially through multiple avenues.

*The Standard of Care*

## The Peri-Operative period

The standard of care for a surgical healthcare facility and a physician conducting breast implant surgery in such a facility require the following:

> • Appropriate measures for decolonization and disinfection of skin-level bacteria, prior to performing surgery.

Disinfecting the skin prior to surgery has long been a standard of care. Whether with iodine, chlorhexidine washes, or other antiseptic surfactants, reducing the bacterial load on the skin surface has been established as an important mechanism to control the rate of post-surgical infection. The standard of care called for Ms. Phillips' skin to be disinfected with an appropriate antiseptic surfactant, such as an iodine-based or chlorhexidine wash, prior to surgery.

> • Appropriate measures to prevent contamination of implants, themselves, prior to implantation.

Contamination of the breast implant, itself, is another possible avenue of infection. While the implant should be free of any contaminant upon entering the sterile field of the operating room, it can be contaminated by any contact with a non-sterile surface, including the non-sterile hands of a healthcare provider. The standard of care calls for the

31

implant, itself, to be kept in sterile hands and an aseptic environment prior to implantation.

- Maintenance of a sterile surgical environment.

A sterile field is a specific area that is considered free of microorganisms. Maintaining a sterile field is not an easy task because there are many chances for a breach in sterility during set-up and maintenance of the sterile area, but it is an essential task. At a minimum, all personnel who are required to be scrubbed and sterile prior to a procedure must scrub appropriately and avoid touching any non-sterile surface until within the sterile field, and all instruments within the sterile field must be sterile. It is the responsibility of every healthcare facility to develop, approve, and implement policies and procedures, as well as educate station procedures, to maintain the sterility of the surgical environment. The entire surgical team, including physicians and nurses, has a responsibility to provide and maintain a safe environment for patient care. This is the standard of care.

. . .

### *Breach of the Standard of Care*

The nature of Ms. Phillips' infection suggests three potential avenues, all of which constitute breaches of the standard of care: inadequate skin decolonization or disinfection with antibacterial washes in the surgical field prior to the initiation of surgery; contamination of the breast implants; and/or, a break in sterile technique during surgery. If Ms. Phillips had had her surgery in a surgical facility that carefully practiced standard of care aseptic protocols and processes in the operating room that observed the standard of care, then Ms. Phillips would not have developed the infection previously described in either breast.

### **The Peri-Operative Period**

- Appropriate measures for decolonization and disinfection of skin-level bacteria, prior to performing surgery.

In reasonable probability, the operating room staff of First Street Surgical Center breached the standard of care by failing to appropriately disinfect Ms. Phillips' skin prior to commencement of her surgical procedure. Ms. Phillips' infection by the particular bacteria later developed in cultures should have been prevented by appropriate decolonization and disinfection measures within the standard of care. The fact that she suffered such infection post-surgery suggests a breach

of the standard of care. This is not simply a " bad outcome" that might be expected from a surgical procedure but one that was entirely avoidable with appropriate measures by First Street Surgical Center personnel. Moreover, as the physician in charge and the head of the surgical team, Dr. Ciaravino was responsible for seeing that appropriate infection control procedures were followed. The failures of both Dr. Ciaravino and the staff of First Street Surgical Center were breaches of the standard of care.

> • Appropriate measures to prevent contamination of implants, themselves, prior to implantation.

As noted above, an additional explanation for Ms. Phillips' post-surgical infection was contamination of the implants, themselves. While the medical record does not identify contamination of Ms. Phillips' breast implants, this is unsurprising, but the results speak for themselves. One bacterium found in Ms. Phillips' later cultures—*Klebsiella oxytoca*—is transmitted by direct contact from the hands of persons who are colonized with the bacterium. This suggests that the implants themselves were subject to contamination before implantation. Failing to ensure that a patient's implants were free from contamination was a breach of the standard of care.

> • Maintenance of a sterile surgical environment.

Maintenance of the sterile surgical field is essential, and the appearance of bacteria in an otherwise healthy patient is an indicator that the operating facility and the surgeon did not follow strict sterile procedures. It suggests that personnel did not follow strict protocols for maintaining a sterile environment, including scrubbing prior to the procedure and ensuring that anyone contacting the patient directly wore appropriate sterile gloves and protective garb. In the case of Ms. Phillips, she suffered significant infection that should not have occurred in a genuinely sterile operating environment and that required direct contact to transmit the infection. Maintaining the sterile environment was First Street Surgical Center's task . . . . The failure to do so was a breach of the standard of care.

First Street contends that Drs. Miller and Nolan opined there were three possible breaches of the standard of care, but they failed to point to any evidence that these alleged breaches actually occurred. First Street contends that, in opining it breached

33

a standard of care, Drs. Miller and Nolan "rely solely on the fact that Phillips developed an infection six days after her surgery"; but, according to First Street, it is "not enough to simply say a breach occurred because Phillips developed an infection." First Street also complains that neither expert stated what First Street should have done differently to prevent Phillips's infection.

Viewing the expert reports in their entirety, we conclude they provide a fair summary of the standard of care and how First Street allegedly breached it.

The expert reports state the standard of care for a surgical healthcare facility like First Street called for three actions: (1) "Ms. Phillips' skin [had] to be disinfected with an appropriate antiseptic surfactant, such as an iodine-based or chlorhexidine wash, prior to surgery" because "reducing the bacterial load on the skin surface has been established as an important mechanism to control the rate of post-surgical infection"; (2) the implant had to be "kept in sterile hands and an antiseptic environment prior to implantation" because contamination of the breast implant "by any contact with a non-sterile surface, including the non-sterile hands of a healthcare provider," is another possible avenue of infection; and (3) the surgical environment had to be kept sterile and it was "the responsibility of every healthcare facility to develop, approve, and implement policies and procedures, as well as educate station procedures, to maintain the sterility of the surgical environment," which includes that "all personnel who are required to be scrubbed and sterile prior to a procedure must scrub appropriately and avoid touching any non-sterile surface until within the sterile field, and all instruments within the sterile field must be sterile."

The experts also explained that First Street breached the applicable standard of care by failing to adequately disinfect Phillips's skin with antibacterial washes prior to her surgery, by failing to prevent contamination of the breast implants, and

by failing to maintain a sterile surgical environment. They opined that, if First Street had "carefully practiced standard of care aseptic protocols and process in the operating," Phillips would not have developed an infection in either breast.

Drs. Miller and Nolan explained that the bacteria identified on Phillips's breast wounds are "considered part of the normal colon flora" and are fecal sourced bacteria, indicating fecal contamination of Phillips's breasts. These bacteria are not airborne but are spread "through person-to-person contact, such as through contact with the infected hands of healthcare personnel," and through contact with "contaminated surfaces such as through the shedding of skin cells from O[perating] R[oom] personnel landing in the surgical field." Thus, the experts opined that Phillips suffered the infection because First Street breached the applicable standard of care in three different ways.

With respect to his opinion that First Street breached the applicable standard of care by failing to adequately disinfect Phillips's skin with antibacterial washes prior to her surgery, Dr. Miller explained that Phillips's infection "by the particular bacteria" was not something to be expected from a surgical procedure and could have "been entirely" prevented had First Street followed the applicable standard of care and appropriately disinfected Phillips's skin prior to surgery. Regarding their opinion that First Street breached the standard of care by failing to prevent contamination of the breast implants, the experts explained that "one bacterium found in Ms. Phillips' later cultures—*Klebsiella oxytoca*—is transmitted by direct contact from the hands of persons who are colonized with the bacterium" or by "direct contact with contaminated surfaces." The experts explained that this in turn shows the implants themselves were subject to contamination before implantation, and failing to ensure that Phillips's implants were handled or transported in an aseptic fashion constituted a breach of the standard of care.

With respect to their opinion that First Street breached the standard of care by failing to maintain a sterile surgical environment, the experts stated that Phillips suffered "significant infection that should not have occurred in a genuinely sterile operating environment and that required direct contact to transmit the infection." Dr. Nolan explained that the "development of infection in, not one, but two breast implants due to fecal bacteria" shows the operating room failed to follow strict aseptic procedures. Dr. Miller explained that the "appearance of bacteria in an otherwise healthy patient" shows the operating facility failed to follow strict sterile procedures. The experts explained that this means "personnel did not follow strict protocols for maintaining a sterile environment, including scrubbing prior to the procedure and ensuring that anyone contacting the patient directly wore appropriate sterile gloves and protective garb."

When viewing the expert reports in their entirety, rather than isolating specific portions or sections, we cannot agree with First Street's contention that the experts failed to explain how it breached the applicable standard of care and what it should have done differently to prevent Phillips's infection. *See Baty*, 543 S.W.3d at 695. Both expert reports reference the specific conduct called into question and what First Street should have done differently to prevent the infection Phillips suffered. *See id.* Additionally, the experts did not just state the standard of care and then conclude it was breached. Nor did the experts equate negligence with a bad result (Phillips's infection), as First Street asserts. The experts did not simply opine that First Street breached the standard of care because Phillips suffered an infection. The stated failure to adequately disinfect Phillips's skin before surgery, to prevent contamination of the implants, and to maintain a sterile surgical environment "is not a result, good or bad; it is the conduct that allegedly caused a bad result in this case." *See id.* at 696. It is this specific conduct that Drs. Miller and Nolan opined fell below

the standard of care. *See id.*

We conclude the trial court did not abuse its discretion when it determined Dr. Miller and Dr. Nolan provided a fair summary of how First Street deviated from the applicable pre-operative standard of care.

Accordingly, we overrule First Street's second issue.

## C. Causation

In its third issue, First Street asserts the trial court improperly denied its motion to dismiss because Dr. Miller's third report and Dr. Nolan's revised report are "conclusory as to the causal relationship between First Street's alleged breaches and Phillips' injuries."

As we stated above, the Legislature enacted the expert report requirement in section 74.351 to deter frivolous claims. *See Palacios*, 46 S.W.3d at 878. The statute does not require a plaintiff to marshal all of the proof necessary to establish causation at trial. *Wright*, 79 S.W.3d at 52; *see also Potts*, 392 S.W.3d at 631 ("[T]he purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits.") (internal quotation marks omitted). Nor does a plaintiff have to provide an expert report that anticipates and rebuts all possible defensive theories that ultimately may be presented at trial. *Monga*, 2018 WL 505263, at *11. However, an expert report must include a fair summary of the expert's opinions regarding the causal relationship between the failure of the healthcare provider to provide care in accordance with the pertinent standard of care and the injury, harm, or damages claimed. *Harvey*, 578 S.W.3d at 653. An expert must explain, based on the facts set forth in the report, how and why a healthcare provider's breach of the standard of care caused the injury. *Abshire*, 563 S.W.3d at 224; *Zamarripa*, 526 S.W.3d at 459-60. A bare expert opinion that the breach caused the injury is not

37

enough. *Harvey*, 578 S.W.3d at 653. In assessing whether the expert's causation conclusions are detailed enough, as with breach of the standard of care, we read the expert's conclusions on causation in the context of the entire report, not piecemeal or in a vacuum. *Id.*

With regard to causation, Dr. Miller's report[9] provides (in pertinent part) as follows:

*Causation*

**The Peri-Operative Period**

During Ms. Phillips' surgery, a break in the aseptic technique used in the operating room with respect to the conduct of First Street Surgical Center . . . was a cause that was a substantial factor in bringing about the fecal sourced bacteria that was a substantial factor in bringing about her infection, and without which cause such infection would not have occurred. The fact that she developed the previously described infections in both breasts indicates that a major breach in aseptic protocols occurred.

Infections of the type that Ms. Phillips experienced are completely preventable when physicians and surgical facilities follow good aseptic technique. In reasonable probability, First Street Surgical Center['s] . . . failure to follow appropriate aseptic procedures allowed bacteria to be present and grow on surfaces where they ultimately contacted Ms. Phillips['] surgical site. In reasonable probability, the failure to properly cleanse and disinfect Ms. Phillips' own skin prior to surgery allowed bacteria already present on her skin to infect her surgical site. Further, and again in reasonable probability, the failure to ensure aseptic treatment of her breast implants allowed those implants to become inoculated with bacteria, which were then introduced to her body during the surgical implant procedure. Finally, and once again in reasonable probability, the failure of facility staff to maintain proper aseptic protocols—ensuring proper scrubbing and that only clean, aseptically gloved hands handled surgical instruments and implants—

---

[9] Because the parties do not dispute that the reports of Dr. Nolan and Dr. Miller are almost identical in their discussion of the pre-operative care in this case, we only quote Dr. Miller's report here.

allowed the introduction of infectious pathogens into her body.

Once infection is introduced into what should be a sterile environment, that environment is no longer sterile. Neither a physician nor a surgical facility should ever allow invasive surgery in a non-sterile environment, but this is what likely occurred in the case of Ms. Phillips. Surgical environments produce a hardier type of bacteria, due to the frequent use of antibiotics in such environments. Bacteria will often become resistant to antibiotic treatment, and aseptic protocols are consequently that much more important.

In reasonable likelihood, First Street's . . . failure[] strictly to follow such protocols allowed Ms. Phillips' surgical site to become infected. The infections clearly caused the need for her to undergo the explant surgery, a prolonged hospitalization at Hermann Memorial, and future reconstructive surgery. This negligent medical care proximately caused her above described infections and resulted in Ms. Phillips incurring the cost for such subsequent medical care, experiencing painful injuries, and other damages.

. . .

**Conclusion**

In summary, I think that there are significant breaches of the standard of care by . . . First Street Surgical Center that caused both Ms. Phillips' infection and a delay and worsening of that infection before she received effective treatment. My opinions expressed in this report are stated to a reasonable degree of medical probability. I reserve the right to amend any opinion stated herein should I receive additional information.

First Street asserts the expert reports are "conclusory as to the causal relationship between First Street's alleged breaches and Phillips' injuries" because the experts "concluded that the fact that she developed an infection in both breasts indicates that there was a major breach in aseptic technique," but the experts did not identify the source of the contamination or account for the six-day gap between her surgery and when she first presented with symptoms of an infection.

However, reading the experts' statements on causation in the context of their entire reports, we disagree with First Street's contention that the "reports are entirely

39

conclusory." We reject First Street's argument that the experts did not identify the source of the contamination in this case because they (according to First Street) "provided [three] possibilities of where the infection could have developed" — namely First Street's alleged failure to adequately disinfect Phillips's skin before surgery, failure to prevent contamination of the implants, and failure to maintain a sterile surgical environment.

Both experts clearly stated the source of the infection was fecal bacteria. They then explained that in reasonable probability the failure to (1) properly cleanse and disinfect Phillips's skin prior to surgery allowed bacteria already present on her skin to infect the surgical site; (2) ensure aseptic treatment of Phillips's breast implants allowed those implants to become inoculated with bacteria which were introduced into her body during the implant procedure causing her infection; and (3) maintain proper aseptic protocols, like proper scrubbing and only handling the implants and surgical instruments with aseptically gloved hands, allowed introduction of the bacteria into Phillips's body leading to her infection.

First Street seemingly faults Drs. Miller and Nolan for addressing every probable cause for Phillips's infection. However, we have been presented with no reason to believe there was only a single cause for her infection. In other words, discovery could show that the fecal bacteria was introduced because of a failure to properly scrub, a failure to aseptically handle the implants, and/or a failure to properly disinfect Phillips's skin. One, two, or all three of the alleged failures by First Street could have caused her infection. Since experts are not required to exclude or rule out every possible cause of an injury, experts cannot be faulted for addressing all probable causes, as Drs. Miller and Nolan did here. *See New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 69-70 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *Baylor Med. Ctr. at Waxahachie, Baylor Healthcare Sys. v. Wallace*,

40

278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.). Addressing all probable causes in their expert reports does not render the reports conclusory.

Further, we do not find any validity in First Street's contention that the expert reports are conclusory because Drs. Miller and Nolan did not address the "gap between the time of the surgery and the time of the alleged infection." The fact that the experts did not specifically address how long it takes for an infection — caused by bacteria introduced because of a pre-surgery breach of the pertinent standard of care — to manifest itself does not render their reports conclusory. A plaintiff is neither expected nor required to "marshal all of her evidence or prove her case against a particular defendant" at this early stage of litigation. *See Puppala v. Perry*, 564 S.W.3d 190, 200 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Hayes v. Carroll*, 314 S.W.3d 494, 507 (Tex. App.—Austin 2010, no pet.).

The two-fold purpose of an expert report under section 74.351 is to inform the defendant of the specific conduct the plaintiff has called into question, and to provide the trial court with a basis to determine whether the plaintiff's claims have merit. *Pokluda*, 283 S.W.3d at 123. Applying this standard, we conclude that Dr. Miller's third report and Dr. Nolan's revised report sufficiently address the element of causation and link the alleged pre-surgery breaches of the standard of care to Phillips's infection. Thus, keeping in mind that expert reports are a preliminary method to show a plaintiff has a viable claim that is not frivolous or without expert support, we hold the trial court did not abuse its discretion in concluding the reports of Drs. Miller and Nolan complied with section 74.351's causation requirement. Accordingly, we overrule First Street's third issue.

## D.    Conclusion

We overrule First Street's issues, and we affirm the trial court's order denying its motion to dismiss.

## DISPOSITION

We affirm the trial court's order denying Dr. Ciaravino's and First Street's motions to dismiss.

/s/    Meagan Hassan
       Justice

Panel consists of Chief Justice Frost and Justices Wise and Hassan.